# Boswell *v.* The State.

### *Indictment for Murder.*

1 *Proof of insanity.*—On the question of insanity *vel non*, sleeplessness and nervous restlessness are admissible evidence; inconclusive, of course, but still a circumstance to be weighed by the jury.

2. *Exception to evidence; certainty requisite in.*—Where the bill of exceptions sets out evidence, some of which is inadmissible, in one continuous sentence, and then adds, "The State objected to this testimony as it was offered, and the court sustained each objection, and the defendant separately excepted ;" the exception is wanting in the requisite definiteness and certainty.

3. *Insanity as defense.*—Since an unsound mind can not form a criminal intent, which is an indispensable element of every crime, insanity, when fully proved, is a complete defense to a criminal charge; but no defense is more easily similated, and the evidence adduced in support of it should be carefully and considerately scanned. It is difficult to lay down an absolute rule for the government of all cases, and each case must depend, more or less, on its own particular facts.

[Boswell v. The State.]

4. *Same.*—Prior to the decision in *McNaghten's case*, before the House of Lords in 1843 (10 Cl. & F. 200), the test of insanity, as a defense to a criminal charge, was, in the great majority of English cases, held to be the capacity to know right from wrong. But the rule laid down in that case, which this court adopts, as applicable to cases of insane delusion, or partial insanity, holds a person not responsible criminally for an act committed under the influence of an insane delusion existing in his mind at the time, *when* (and *only when*) the fact, or state of facts, the existence of which he believes under such insane delusion, would, if actually existing, justify or excuse the act.

5. *Same.*—To justify the inference of insanity, such as will justify or excuse a homicide, from the calmness of manner and indifference to results, which sometimes mark the conduct of such persons, there should be convincing evidence of previous insanity, or insane delusions, so recent as, when coupled with the causelessness of the killing, to raise the presumption that the paroxysm had not entirely passed away. On the other hand, calmness, indifference to results, and consciousness of the criminality of the act, with connectedness in the employment of the reasoning faculty, while not conclusive, are strong circumstances tending to prove legal accountability.

6. *Same.*—Moral insanity, which consists of irresistible impulse, co-existing with mental sanity, has no support either in psychology or in law.

7. *Same; burden and measure of proof.*—The law presumes sanity, and that presumption must prevail until it is overcome; and when insanity is set up as a defense in a criminal case, whether the evidence of it arises out of the testimony which proves the commission of the act, or is shown *aliunde*, it is insufficient until it overturns the presumption of sanity. (*The State v. Marler*, 2 Ala. 43, and *Brinyea v. The State*, 5 Ala. 241, commented on, as self-repugnant on this question.)

FROM the Circuit Court of Talladega.

Tried before the Hon. JOHN HENDERSON.

The prisoner in this case, George Boswell, was indicted for the murder of Eliza Embry, by stabbing her with a knife; was tried on issue joined on the plea of not guilty; found guilty of murder in the first degree, and sentenced to be hanged. The prisoner was a mulatto man, whose former wife had been dead five or six years, leaving several children living with him, the oldest being a boy about fifteen years old; and Eliza Embry was a young mulatto woman, whom he had been courting, and who, as he claimed, had promised to marry him, but married another man, Wesley Embry by name. The murder was committed on the 2d February, 1878, about the middle of the day, on the public square in Talladega, a few minutes after the said Eliza and Wesley Embry had been married by the probate judge in his office. The circumstances immediately preceding the commission of the crime were thus stated by the probate judge, who was examined as a witness for the prosecution: "On the 2d of February, 1878, between one and two o'clock, P. M., while I was preparing a marriage-license for Wesley Embry and Eliza Truss, the defendant came into my office, and asked me, 'if a girl could obtain a license to marry another man, after having promised to marry him.' I told him, 'yes; that she had the right to change her mind;' and he then left the

room. After I had married Wesley and Eliza, and Wesley had gone out, the defendant returned, and sat down close to Eliza, and held some conversation with her, none of which I understood. The south door of the room was opened by some one (Mr. Hamill, I think), and Eliza, rather hastily, moved her chair from near the defendant, to a point near me, and sat down. About this time Wesley returned to the room, and proposed to Eliza that they go home. She immediately got up, and gathered up some bundles and wraps, and the three left the room; Wesley going in front, Eliza next, and the defendant last. In a very short time I heard screams in the court-yard, and, looking out of the window, saw the defendant have Eliza pushed back against the bell-tower, with one arm around her, and striking her with the other; and I saw Eliza get loose from him, and run away. I ran to the west door of the room, and just after I stepped out of it, the defendant walked up to me, and said, '*Judge, I done it. She promised to marry me, and has gone back on me.*'" (Or, as afterwards stated by the witness, "*Judge, I done it, and if I have got to hang, let me hang. She promised to marry me, and has married another fellow: she has gone back on me.*") The deceased ran several steps, and fell, and died in a few minutes; her throat being cut, and eight other wounds with a knife being inflicted on her person.

Another witness for the prosecution, who saw the stabbing, testified that he was standing on the steps of the court-house when the parties came out of the probate judge's office, and thus proceeded: "I heard George [the prisoner] say, 'Wesley, you go on, I've got something to tell Liza.' Wesley went on, towards the fence beyond the bell-tower; and George then said, 'Liza, you've gone back on me.' She said, 'George, I didn't love you well enough to marry you.' By this time, they were opposite the bell tower, and Wesley was outside of the fence, at his buggy. George seized Eliza, and stabbed her three or four times. She screamed, and jerked away from him, and ran towards the east side of the square; and he walked back towards the west door of the court-house, and gave himself up to Judge Thornton. The stabbing was done in plain view of a large number of people. George was not excited, and did not look like he had been drinking. He did not try to get away, but went quietly to Judge Thornton, and gave himself up." Another witness for the prosecution testified that, about one o'clock in the afternoon of that day, the defendant came into his store, where guns, pistols, and knives were kept for sale, and bought a knife with two blades, the larger one being from three to three and a half inches long; "saying that he wanted a keen, sharp knife, that would

[Boswell v. The State.]

cut leather." The mother of the deceased testified, among
other things, that the prisoner came to her house one night,
in December preceding the killing, and she heard him ask
Eliza to marry him ; and that on her refusal, she heard him
say : "My God, woman, where is your heart? If you marry
any body but me, I'll cut your throat, and cut my own throat,
and send my soul to hell." Another witness for the prose-
cution testified, that he met the defendant one morning in
December, coming from the direction of the house where the
deceased was living with her father and mother ; that the
defendant stopped him, and during their conversation said :
"I am afraid they are going to pull back on me down there ;
and if they do, it will break my heart, and I will kill." The
sheriff of the county, who was introduced as a witness for
the defense, testified that, when he arrested the defendant,
immediately after the killing, he took from him a pistol with
five barrels, all loaded, a knife with two blades, the larger
one being bloody and slightly bent, some papers and money,
and two pint-bottles of whiskey, one of which was full, and
the other about one-third full.

Insanity was set up as a defense. Several witnesses testi-
fied to the intimate relations which existed between the de-
ceased and the prisoner, for some time previous to the kill-
ing, the messages which were sent between them, the pres-
ents which he had given to her, and the preparations he
had made and was making for his approaching marriage
with her, which, as he said, was to take place in a short time.
Several exceptions were reserved by the defendant to the
rulings of the court in excluding portions of this evidence,
but, as the case is here presented, they require no particular
notice. "Charley Boswell was introduced as a witness by
the defendant, and testified as follows : 'I am a son of the
defendant. My mother has been dead five or six years. I
have a sister and two brothers. I am the eldest, and am
fifteen years old. We lived last year on Dr. McClellan's
place. During last January, we lived on James Wood's
place. I knew Eliza Truss, and have often seen her and my
father together, and have carried messages between them.
One message was, Edie Collins told me to tell my father that
Eliza wanted him to meet her at Edie's on last Christmas
night. I delivered that message, and it was the last one.
My father was away from home a good many nights last
January. My father and we children lived in a house by
ourselves on Mr. Wood's place.' The defendant offered to
prove by this witness, that the defendant slept very little last
January during the nights he was at home ; that he was rest-
less at night, and spent much time in walking the floor, and

complained of being unable to sleep; also, that he had heard defendant say he was engaged to marry Eliza Truss, and was going to bring her home soon, for a new mother for him; also, that defendant brought home provisions, and articles of household furniture, saying that he was going to marry Eliza Truss, and was fixing to go to house-keeping. The State objected to this testimony, as it was offered, and the court sustained each objection; and the defendant separately excepted." It was proved that the defendant's character was that of a quiet and peaceable man, but some of the witnesses said that he was nervous and excitable, though they had never known him to be engaged in any personal difficulty. One absent witness for the defendant, a written statement of whose testimony was admitted, detailed an occurrence which took place about ten years before the killing, and during the life of the defendant's wife, when the defendant attempted to kill him, on finding him at his (defendant's) house eating supper with his wife; but begged his pardon the next time he saw him, and said that he was not in his right mind at the time. Another absent witness, whose testimony was admitted in the same way, saw the defendant with Eliza and Wesley Embry on the morning the killing occurred, while they were on their way to town, the defendant walking, and the others riding in a buggy; saw the defendant help Wesley to fix one of the shafts of the buggy, and saw him talking and laughing with Eliza and Wesley; and she said that " he seemed in a good humor, and his manner was quiet and as usual." Numerous exceptions, over fifty in all, were reserved by the defendant to the rulings of the court in excluding evidence; but a statement of these matters is not material to an understanding of the points decided by this court. The bill of exceptions is very long, and purports to set out all the evidence adduced.

The court charged the jury in writing, and several exceptions were reserved by the defendant to different portions of the charge; the parts excepted to being inclosed in brackets, as follows:

" The law presumes that the defendant is innocent, and the State must prove to the jury that he is guilty beyond a reasonable doubt, as charged, before you can so find him. Murder is the felonious taking of human life, with malice aforethought. Malice is such a depraved and wicked condition of mind as shows a total disregard of social duty, and a heart or will bent wholly on evil. Malice may be express or implied. Threats to take life, without any provocation, or without reasonable provocation(?). Malice may be implied or inferred from the deliberate perpetration and use of dead-

ly weapons in taking human life. If the killing was intentionally done by the defendant, and without reasonable provocation, justification, or excuse, the law conclusively presumes that it was done with malice aforethought. [Passion, without a reasonable provocation, which causes one person to take the life of another, is malice.] [It is, therefore, not a question proper for your consideration, whether the defendant was impelled by passion to take the life of Eliza Embry (if he in fact killed her), unless the circumstances and causes that moved him to take life were such as to have excited the passion and provoked a reasonable man to such an extent as to dethrone reason, and excite passion beyond control.] [All persons are alike bound to control their passions; and the law, in such cases, makes no more allowance for the passions and temper of one man, than for the passions and temper of others; and passions, not founded on reasonable provocation, will not reduce a killing from a higher to a lower degree of homicide].

"If the defendant, in this county, and before the finding of the indictment in this case, willfully, maliciously, deliberately, and with premeditation killed Eliza Embry, by stabbing her with a knife, then he is guilty of murder in the first degree. To constitute murder in the first degree, it is not necessary that the willful, malicious, deliberate, and premeditated purpose to take life should have existed with the defendant any particular length of time before the killing. If the malice existed at and before the killing, though but for an instant of time, it was malice aforethought; and if the defendant distinctly formed in his mind the purpose to take the life of Eliza Embry, and thought over the matter, and prepared for it before the killing, and killed the deceased in accordance with this formed purpose or design; it would be a willful, malicious, deliberate, and premeditated killing, and, consequently, murder in the first degree. [If the defendant killed the deceased, because she refused to marry him and married another man, even though she may have promised to marry him before she married Wesley Embry, this would not be such provocation as would reduce the killing from murder in the first degree to murder in the second degree, if, independent of the fact of her promise to marry the defendant, you find all the elements of murder in the first degree, as above described, to exist in this case]. If the defendant, in this county, and before the finding of this indictment, willfully, and with malice aforethought, but without either deliberation or premeditation, killed Eliza Embry by stabbing her with a knife, then he is guilty of murder in the second degree.

" [When the plea of insanity is interposed, to protect one from the legal consequences of an act which amounts to a crime, to render the defense available, the evidence must be such as to convince the minds of the jury that, at the time the act was done, the accused was not conscious that, in doing the particular act, he was committing a crime against the laws of God and his country]. [If he knew right from wrong, and knew that he was violating the law, he is then guilty ; for it is the conscious knowledge, connected with the act, that constitutes the crime.] [If, therefore, the accused insists that he was insane, he must adduce proof that will satisfy the jury that the act was not connected with the knowledge of its criminality ; and this proof should be clear and satisfactory.]

" It is expected of parties, attorneys, and sometimes of witnesses, that they feel deeply interested in the result of causes affecting great and vital interests. It is all right and proper, and even commendable in counsel, to manifest zeal in the advocacy of causes confided to them, in proper bounds. But courts and juries must look at things from a different standpoint. As jurors, you can have no anxiety to convict the defendant on account of any real or supposed enormity of the offense with which he is charged : you can have no sympathy with either the living or the dead ; and if either should enter into your verdict this trial would be a mockery, and you parties to it. The evidence in the case is the great polar-star, in the light of which you are to pursue your investigations after the truth of the matters submitted for your decision. Without anxiety to convict the defendant, without animosity to any one, without sympathy for the living or the dead, and, like the law, knowing no man, weigh the evidence honestly, faithfully, and impartially, and on it, and it alone, render a truthful verdict.

" [If you find the defendant guilty of murder in either the first or second degree, then, under the law, you must determine what punishment shall be inflicted on him for his crime.] [It is laid down in the law-books, that the object of punishing crime is two-fold—to reform offenders, and to make such an example of offenders as will deter others from offending in like manner. Murder in the first degree is punished with death, or imprisonment in the penitentiary for life, at the discretion of the jury. Murder in the second degree must, on conviction, be imprisoned in the penitentiary, or sentenced to hard labor for the county, for not less than ten years, at the discretion of the jury. If you find the defendant guilty, the form of your verdict will be, ' *We, the jury, find the defendant guilty of murder in the —— degree,*' the

degree you may agree on, '*and sentence him to*,'—here insert the punishment you may agree on, and one of you sign it as foreman. If you find the defendant not guilty, you will so say by your verdict, and one of you sign it as foreman.]"

The defendant excepted to this entire charge, and also to each part separately which is included in brackets; and he then requested the court to give the following charges, which were in writing:

"1. Drunkenness may produce a state of mind which would render a person incapable of forming or entertaining the design or intention to take life; and if the jury find, from the evidence, that the defendant was in such a state of mind, from drunkenness, at the time of the killing, then they can not find him guilty of murder.

"2. Before the defendant can be convicted of murder, the jury must be satisfied by the evidence, beyond all reasonable doubt, that he intended to take life; and if they believe from the evidence that, at the time of the killing, he was too much intoxicated to have entertained any such intention, then they can not find him guilty of murder.

"3. If, from any cause shown by the evidence to the satisfaction of the jury, the condition or state of the defendant's mind, at the time of the killing, was such as to render him incapable of forming and entertaining the design to take life, then the jury can not find him guilty of murder.

"4. Moral insanity is recognized by the law; and if the jury believe, from the evidence, that the defendant was morally insane when he stabbed Eliza Embry, then he is not guilty.

"5. If the jury believe, from the evidence, that the defendant knew right from wrong when he stabbed Eliza Embry, they must further find that he had the power to refrain from the wrong, or they must acquit him.

"6. A man morally insane, acting from an irresistible and uncontrollable impulse, is not responsible for that act; and if the defendant was in that condition, and was so acting at the time of the killing, he must be acquitted.

"7. If, at the time of the killing, the defendant's intellectual power was for the time overwhelmed by violent mental disease, he must be acquitted.

"8. If, by the overwhelming violence of sudden mental disorder, the defendant's intellectual power was obliterated, at the time of the killing, the jury must acquit him.

"9. If, by the overwhelming violence of sudden mental disorder, no matter what may have caused such disorder, the defendant's intellectual power was obliterated at the time of the killing, he must be acquitted.

[Boswell v. The State.]

"10. Did the defendant, in committing the homicide, act from an irresistible and uncontrollable impulse? If so, the act was not that of a voluntary agent, but the involuntary act of his body, without the concurrence of a mind directing it; and he must, therefore, be acquitted.

"11. If the jury have a doubt of the sanity of the defendant at the time of the killing, they can not find him guilty of murder in the first degree, and sentence him to be hung.

"12. If the jury have a reasonable doubt as to the sanity of the defendant at the time he killed Eliza Embry, they can not find him guilty of murder in the first degree, and sentence him to be hung.

13. If the jury believe, from the evidence, that the defendant loved Eliza Embry, and that she had promised to marry him, but had been married to another man a few moments before the defendant killed her; they can look to these facts in determining the motive with which the deed was done, and in determining what, if any, is the degree of the defendant's guilt."

The court refused each of these charges as asked, and the defendant excepted to their refusal.

GEO. W. PARSONS, for the prisoner.

H. C. TOMPKINS, Attorney-General, for the State.

STONE, J.—It was proposed to prove in this case, by Charley Boswell, a witness for defendant, that, during the month immedately preceding the homicide, defendant "slept very little during the nights he was at home; that he was restless at night, and spent much time in walking the floor, and complained of being unable to sleep." The plea of insanity was relied on in defense; and if this question were so presented that we could consider it, we would be inclined to hold that the evidence ought to have been received. Sleeplessness and nervous restlessness are admissible evidence on questions of sanity *vel non.* Inconclusive, of course; for, in much the larger number of persons thus affected, there is no trace of mental unsoundness. The causes of it are very various. Still, it is a circumstance, although in many cases very slight, to be weighed by the jury.

But we can not pronounce that the Circuit Court erred in this ruling. The testimony was offered in connection with other evidence clearly inadmissible; offered in one continuous sentence, without any stop, or mark of separation. At the end it is said, "The State objected to this testimony, as it was offered, and the court sustained each objection, and

the defendant separately excepted." This is too indefinite. We can not certainly know what were the separate parts, into which this mass of testimony was proposed to be divided; and hence we are left in doubt as to what was the subject of each and every exception reserved. To be the subject of revision here, the exception must clearly point to what it refers.—*Donnell v. Jones*, 13 Ala. 490; *Newton v. Jackson*, 23 Ala. 705; 1 Brick. Dig. 886, § 1186.

It is certainly true that insanity, properly proved, is a complete answer to a criminal charge. An unsound mind can not form a criminal intent; and as crime includes both act and intent, an indispensable constituent is wanting, when the mind of the perpetrator is diseased in that degree, which is, by the law, pronounced insanity. Few subjects have, in later times, been more discussed than diseases of the mind. The tendency of modern research has been to accord to mental disorders a wider scope, than was formerly acknowledged. Care must be maintained, however, that in commiserating and protecting this pitiable class, which appeals so loudly to our sympathies, we do not break down all legal barriers to crime, and leave society at the mercy of those whose evidence of insanity consists in their supreme depravity. No defense, perhaps, is more easily simulated than this; and hence, when presented, its evidences should be carefully and considerately scanned: not with a foregone conclusion to disallow it, as a pretense; not with an undue bias in its favor; but with a firm determination, without partiality or prejudice, to give to the testimony submitted its due weight; nothing more, nothing less.

The questions, what degree of insanity will excuse crime; on whom, and to what extent, is cast the duty of making good, or of overturning the defense of insanity in a criminal prosecution, and the measure of proof necessary to that end, have caused the greatest contrariety of judicial opinion. The case of *McNaghten*, 10 Cl. & Fin. 200, came before the British House of Lords for trial; and their lordships submitted certain questions to the judges of England, which were answered by Lord Ch. J. TINDALL, speaking for all the judges, except Mr. Justice MAULE, who delivered a separate opinion. Among the questions propounded were the following:

1. "What is the law respecting alleged crimes, committed by persons afflicted with insane delusion in respect of one or more particular subjects or persons; as, for instance, where, at the time of the commission of the alleged crime, the accused knew he was acting contrary to law, but did the act complained of with a view, under the influence of insane de-

[Boswell v. The State.]

lusion, of redressing or avenging some supposed grievance or injury, or of producing some supposed public benefit.

2. "What are the proper questions to be submitted to the jury, when a person, alleged to be afflicted with insane delusion respecting one or more particular subjects or persons, is charged with the commission of a crime (murder, for example), and insanity is set up as a defense."

3. "In what terms ought the question to be left to the jury, as to the prisoner's state of mind, when the act was committed."

4. "If a person, under an insane delusion as to existing facts, commits an offense in consequence thereof, is he thereby excused."

The answer of the judges was confined to the letter of the questions. They said: "In answer to the first question, assuming that your Lordships' inquiries are confined to those persons who labor under such partial delusion only, and are not in other respects insane, we are of opinion that, notwithstanding the party accused did the act complained of, with a view, under the influence of insane delusion, of redressing or avenging some supposed grievance or injury, or producing some public benefit, he is nevertheless punishable, according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law; by which expression, we understand your Lordships to mean, the law of the land. As the third and fourth questions appear to us to be more conveniently answered together, we have to submit our opinion to be, that the jury ought to be told, in all cases, that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary is proved to their satisfaction; and that to establish a defense on the ground of insanity, it must be clearly proved, that, at the time of committing the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong. The mode of putting the latter part of the question to the jury on these occasions has generally been, whether the accused, at the time of doing the act, knew the difference between right and wrong; which mode, though rarely, if ever, leading to any mistake with the jury, is not, as we conceive, so accurate when [put generally, and in the abstract, as when put with reference to the party's knowledge of right and wrong in respect to the very act with which he is charged. If the question were to be put as to the knowledge of the deceased, solely and exclusively, with

reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential, in order to lead to a conviction; whereas, the law is administered upon the principle, that every one must be taken conclusively to know it, without proof that he does know it. If the accused were conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable; and the usual course, therefore, has been, to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong; and this course, we think, is correct, accompanied with such observations and explanations as the circumstances of each particular case may require. The answer to the fourth question must, of course, depend on the nature of the delusion; but, making the same assumption as we did before—namely, that he labors under such partial delusion only, and is not in other respects insane—we think he must be considered in the same situation, as to responsibility, as if the facts with respect to which the delusion exists were real. For example, if, under the influence of delusion, he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defense, he would be exempt from punishment. If his defense was, that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment."

Mr. Justice MAULE answered the first of the questions propounded in the negative. His language was: "There is no law, that I am aware of, that makes persons in the state described in the question not responsible for their criminal acts. To render a person irresponsible for crime, on account of unsoundness of mind, the unsoundness should, according to the law as it has long been understood and held, be such as rendered him incapable of knowing right from wrong."

It must not be overlooked, that the judges were considering a case of partial insanity; the case of a person afflicted with "insane delusion in respect of one or more particular subjects or persons." And the opinion most favorable to the accused—that of all the judges except Justice MAULE—was, that insane delusion was no justification or excuse of homicide, unless the perpetrator was insanely deluded into the belief of the existence of a fact, or state of facts, which, if true, would justify or excuse the homicide, under the law as applicable to sane persons.

The case from which we have extracted so largely was

heard before the House of Lords in 1843. Lords BROUGHAM, CAMPBELL, COTTENHAM and WYNFORD expressed gratification at the answers given by the judges. LYNDHURST, then Lord Chancellor, presiding over that august court, said : " I agree that we owe our thanks to the judges, for the attention and learning with which they have answered the questions now put to them." The law of England, on this very delicate question, had been declared, in a very decided majority of important cases, substantially as announced by Mr. Justice MAULE ; though, in some of the earlier cases, a severer rule and measure of proof were exacted, where insanity was relied on as a defense.—See the authorities collected and collated in 1 Russ. on Crimes, 9 to 14.

The case of *Hadfield*, a very celebrated trial for attempting to take the life of the King, seems to have been made somewhat an exception to the rule. This is the case in which Lord ERSKINE made his celebrated argument. We cannot find the report of it in our library ; but in 1 Russ. on Crimes, 12, will be found a summary of the evidence, and the ruling of Lord KENYON on the main question. The prisoner had been severely wounded in battle, and there was strong evidence that, both before and after the assault, he had insane delusions of very pronounced character. The attempt was made in the theatre. It was proved, that the prisoner " sat in his place in the theatre, nearly three-quarters of an hour before the king entered ; that at the moment when the audience rose, on his majesty's entering his box, he got up above the rest, and presented a pistol loaded with slugs, fired it at the king's person, and then let it drop ; and when he fired, his situation appeared favorable for taking aim, for he was standing upon the second seat from the orchestra in the pit, and he took a deliberate aim by looking down the barrel, as a man usually does when taking aim. On his apprehension, amonst other expressions, he said, that he knew perfectly well that his life was forfeited ; that he was tired of life, and regretted nothing but the fate of a woman who was his wife, and would be his wife a few days longer, he supposed. These words he spoke calmly, and without any apparent derangement ; and with equal calmness repeated that he was tired of life, and said that his plan was to get rid of it by other means ; he did not intend anything against the life of the king ; he knew the attempt only would answer his purpose." These facts showed, not only that he knew right from wrong ; not only that he knew he was committing a crime against the law, by which he would forfeit his life ; but it exhibited deliberation, and the exercise of the reasoning faculty. Lord KENYON held, that " as the prisoner was de-

ranged immediately before the the offense was committed, it was improbable that he had recovered his senses in the interim; and although, were they to run into nicety, proof might be demanded of his insanity at the precise moment when the act was committed; yet, there being no reason for believing him to have been at that period a rational and accountable being, he ought to be acquitted." He was acquitted.

This celebrated case suggests several reflections, by which we may be profited in the administration of the law. The first is, that the workings of a diseased mind are so variant, that it is difficult to lay down an absolute rule for the government of all cases. Each case must depend, more'or less, on its own particular facts. And such is the language of the adjudged cases. In the next place, the charge to the jury should be so shaped, as to apply, as far as the law will allow, to the facts of the case on trial. Third, that calmness, indifference to results, consciousness of the moral or legal criminality of the act, with connectedness in the employment of the reasoning faculty, while not conclusive evidence of sufficient sanity to justify criminal punishment, are nevertheless strong circumstances tending to prove legal accountability.

In *Hadfield's case*, we infer from the language of the court, that he would have been adjudged sane and accountable, if it had not been shown that, a very short time preceding the attempt on the king's life, he had shown unmistakable symptoms of insanity. So that his case can scarcely be classed as an exception to the rule, which requires the insanity which excuses to be proven to have existed at the very time the act complained of was committed. The cool, calm, indifferent conduct of the prisoner, his consciousness of right and wrong, were, neither nor all of them, evidences which Lord KENYON regarded as proving insanity. He treated them as *indicia* of sanity, to be overcome. The recent, clearly proved insanity of the prisoner, caused him to believe that, in that case, reason had not re-asserted her dominion. From it he inferred the continued presence of insane delusion, when the causeless, and seemingly unaccountable attempt, was made on the life of the king. So, to justify the inference of insanity from the calmness of manner, and indifference to consequences, which sometimes mark the conduct of the manslayer, there should be convincing evidence of previous insanity, or insane delusions, so recent as, coupled with the causelessness of the killing, to raise the presumption that the paroxysm had not entirely passed away.

The doctrine in regard to partial insanity, asserted by the English judges in *McNaghten's case*, was affirmed in a very

able opinion by Chief Justice SHAW, in *Commonwealth v. Rogers*, 7 Metc. 500. And the same principle is asserted by Wharton in his work on Homicide, § 566, citing many authorities in support of it; and in 2 Greenl. Ev. § 372. See, also, *Franklin v. People*, 52 N. Y. 467; *Spann v. The State*, 47 Geo. 553; *People v. McDonnell*, 47 Cal. 134; *Blackburn v. The State*, 23 Ohio St. 146.

There is a species of mental disorder, a good deal discussed in modern treatises, sometimes called "irresistible impulse," "moral insanity," and perhaps by some other names. If, by these terms, it is meant to affirm that a morbid state of the affections or passions, or an unsettling of the moral system, the mental faculties remaining meanwhile in a normal, sound condition, excuses acts otherwise criminal, we are not inclined to assent to the proposition. The senses and mental powers remaining unimpaired, that which is sometimes called "moral," or "emotional insanity," savors too much of a seared conscience, or atrocious wickedness, to be entertained as a legal defense. GIBSON, C. J., in *Commonwealth v. Mosler*, 4 Barr, 264, while recognizing the existence of moral or homicidal insanity, as "consisting of an irresistible inclination to kill, or to commit some other particular offense," adds: "There may be an unseen ligament pressing on the mind, drawing it to consequences which it sees but can not avoid, and placing it under a coercion which, while its results are clearly perceived, is incapable of resistance." With all respect for the great jurist who uttered this language, we submit if this is not almost, or quite, the synonym of that highest evidence of murderous intent known to the common law: a heart totally depraved, and fatally bent on mischief. Well might he add: "The doctrine which acknowledges this mania is dangerous in its relations, and can be recognized only in the clearest cases. It ought to be shown to have been habitual, or, at least, to have evinced itself in more than a single instance. The frequency of this constitutional malady is fortunately small; and it is better to confine it within the strictest limits. If juries were to allow it as a general motive, operating in cases of this character, its recognition would destroy social order, as well as personal safety. To establish it as a justification in any particular case, it is necessary to show by clear proof, either its contemporaneous existence evinced by present circumstances, or the existence of an habitual tendency developed in previous cases, becoming in itself a second nature." What is meant by "evincing itself in more than a single instance," and how this principle would work in administration, we are left to speculate. Can that be a sound legal

[Boswell v. The State.]

principle, whose 'general recognition would destroy social order, as well as personal safety'? We concur with Mr. Wharton (Hom. § 574), that moral insanity, which consists of irresistible impulse, co-existing with mental sanity, "has no support either in psychology or law."

On the question of the duty and measure of proof on questions of insanity, as a defense in a criminal trial, some rulings have been made in this court. In *State v. Marler*, 2 Ala. 43 (a case of murder), the Circuit Court had charged the jury, "if the facts necessary to constitute the crime of murder had been established by the proof, that it devolved upon the prisoner to prove his insanity at the time of the commission of the act; and if the jury, from the evidence, entertained a reasonable doubt of the prisoner's insanity at the time of the commission of the act, and believed also that it would be murder in him, it would be their duty to find him guilty of murder." The court had been requested to instruct the jury, that a reasonable doubt of the sanity of the prisoner required his acquittal. This court (ORMOND, J.) quoted from the language of MANSFIELD, C. J., in *Bellingham's case*, as follows: ("That in order to support such a defense, it ought to be proved by the most distinct and unquestionable evidence, that the prisoner was incapable of judging between right and wrong; that in fact it must be proved beyond all doubt, that, at the time he committed the act, he did not consider that murder was a crime against the laws of God and nature; and that there was no other proof of insanity, which would excuse murder or any other crime." Judge ORMOND added: "These opinions, which are undoubted law, show the stringent nature of the evidence, by which insanity must be proved, to be an excuse for crime; but we do not understand that even this defense must be established by evidence so conclusive in its nature, as to exclude every other hypothesis. This would be requiring something akin to mathematical proof, of which the subject is clearly not susceptible; but the jury must be fully satisfied that the defense is made out, beyond the reasonable doubt of a well-ordered mind. (To test the case at bar by these principles, the court was moved to charge the jury, 'that if they entertained any reasonable doubt as to the sanity of the prisoner, they must acquit him'; which charge the court refused. Upon the principles here laid down, it was error to refuse this charge. . . . It would have been highly proper that the court, when called on thus to charge, should have explained to the jury that this defense was required to be made out by strong, clear and convincing proof; and guided by these considerations, if they still entertain a

reasonable doubt of the sanity of the prisoner, it was their duty to acquit."

We confess ourselves unable to reconcile the two propositions of this charge. Under the one, the defense of insanity is required to be made out by strong, clear, and convincing proof; under the other, the evidence is sufficient, if it generates a reasonable doubt. If reasonable doubt of the existence of a fact, is equivalent to strong, clear, and convincing proof of its existence, then the charge can be reconciled and understood. With every respect for the able jurist by whom this opinion was delivered, we fear its tendency would be to confuse and mislead the jury. C. J. COLLIER dissented, saying : "A reasonable doubt whether the accused was sane, would not authorize his acquittal. There must be a preponderance of proof to show insanity, to authorize a verdict of not guilty for that cause."

In the case of *Brinyea v. The State*, 5 Ala. 241, the same judges presiding, on the question of insanity as a defense, the Circuit Court had charged the jury, that "the prisoner was bound to make out by testimony, beyond all reasonable doubt, that he was insane at the time the act was committed ; by proof clear, strong, and convincing ; and if, upon the testimony, the jury should entertain no reasonable doubt of the defendant's sanity, they should find him guilty." It will be observed that, in this case, the rule laid down by the Circuit Court, as to the measure of proof of insanity required of the prisoner, was, that it should be shown beyond all reasonable doubt ; and to this the court added : "If the jury entertained no reasonable doubt of the prisoner's sanity, they should find him guilty." This court, in commenting on this charge, said : "The objection to the charge can not avail the prisoner, as it is in strict accordance with the rule declared in *Marler's case.* . . . The prisoner then was bound to make out, by testimony, beyond all reasonable doubt, that he was insane at the time the act was committed ; by proof strong, clear, and convincing. . . . The charge, it is true, is in the negative—that if the jury had no reasonable doubt of the sanity of the prisoner, he should be convicted. This, as it seems to us, is precisely equivalent to a charge, that if a reasonable doubt of his sanity was entertained, the jury should acquit." This charge, then, as construed by this court, and its correctness affirmed, re-asserts the two propositions, which we have said above we can not reconcile. It goes even further, and affirms that insanity, as a defense, must be proved beyond a reasonable doubt ; and then adds, if the testimony generates a doubt of its existence, this is sufficient. Rules of law ought not to be so de-

clared, as to leave the mind bewildered in their attempted solution. Instructions to juries should be clear, and freed from ambiguity.

In *McAllister v. The State*, 17 Ala. 434, this court (Ch. J. DARGAN delivering the opinion) said : "When the plea of insanity is interposed, to protect one from the legal consequences of an act which amounts to a crime, to render the defense available, the evidence must be such as to convince the minds of the jury that, at the time the act was done, the accused was not conscious that, in doing the particular act, he was committing a crime against the laws of God and his country. If he knew right from wrong, and knew that he was violating the law, he is then guilty ; for it is this conscious knowledge, connected with the act, that constitutes the crime." We feel at liberty to affirm that the question of the measure of proof, on the defense of insanity, is not settled in this court.

Much has been written, and there is much hypercriticism in the discussion of the propositions, that, in criminal prosecutions, the *onus* is never shifted, and that the presumption of innocence accompanies the prisoner through all the stages of his trial. These are valuable canons of the law, but, like most other general rules, are subject to some modifications in their application, the observance of which is essential to the good order and well-being of society. Murder, at common law, is made up of two ingredients, the act and the intent. All men are presumed to intend the natural result of their voluntary acts. The voluntary employment of a deadly weapon, lying in wait, the administration of poison, each supplies the presumption, which, unexplained, is proof of the intent, or malice aforethought, which stamps the homicide as murder. Proof of the killing and the manner of it accomplishes the purpose of establishing the *factum* or act, and the felonious intent, or formed design with which it is done, unless, in the testimony which proves the act, or in some other proof, the offense is extenuated or excused. The common-law definition of murder declares, that the malice which characterizes its bad eminence may be implied, as well as expressed. So, one found in possession of goods, proven to have been recently stolen, is presumed to be the thief, until explanation of his possession is given. Many statutes which create offenses out of certain acts, unless certain conditions exist, cast on the accused the duty of excusing himself, by proof of the required conditions. In this class are the offenses of carrying deadly weapons concealed about the person, and retailing spirituous liquors without license. So then there are cases in the law, where one material element

[Boswell v. The State.]

of a crime is inferred from the proof which establishes the other, if there be before the jury only the testimony which establishes that other fact. We imagine, also, there is a distinction and a difference between the constituent facts which make up a given crime—murder, for example—and which facts are common to every case within the class, and those occasional, or exceptional questions of fact, which do not necessarily belong to the class, but may be termed the accidents of the case. That a reasonable creature in being was killed; that the prisoner on trial was the agent, or manslayer, and that he did the act with malice aforethought, express or implied, are facts necessary to be shown in every successful prosecution for murder. To this extent, and to each of these constituent, indispensable elements, the burden rests with the State to prove their existence, beyond a reasonable doubt. The presumption of innocence, in which all men are primarily panoplied, follows, and guards them through all the stages of the trial, until these uniformly constituent facts are established. The law, in its firm, yet conservative morality, declares that all men, who have attained to years of discretion, are presumed to be of sound mind; and without any proof of that fact, resting securely in the presumption of sanity, it adjudges the offender shall suffer its penalties. But, there are persons of mature years, whose minds are so diseased, as that they are incapable of discriminating between right and wrong; and this defense is set up, in avoidance of the facts which, otherwise, stamp the prisoner as a murderer. We here enter the field of the exceptional, the accidental; and inasmuch as the law presumes sanity, that presumption, like that of innocence, should prevail throughout the trial, until it is overcome. And whether the evidence of insanity arise out of the testimony which proves the homicide, or is shown *aliunde*, reason and analogy alike declare it is insufficient, until it overturns the presumption of sanity.

In *Commonwealth v. Eddy*, 7 Gray, 583, the court said: "The burden is on the commonwealth to prove all that is necessary to constitute the crime of murder. And as that crime can be committed only by a reasonable being—a person of sane mind—the burden is on the commonwealth to prove that the defendant was of sane mind when he committed the act of killing. But it is a presumption of law that all men are of sane mind; and that presumption sustains the burden of proof, unless it is rebutted and overcome by satisfactory evidence to the contrary. In order to overcome this presumption of law, and shield the defendant from legal responsibility, the burden is on him to prove to the satisfac-

tion of the jury, by a preponderance of the whole evidence in the case, that, at the time of committing the homicide, he was not of sane mind."

Pennsylvania stands unmistakably committed to the same doctrine.—*Ortwein v. Commonwealth,* 76 Penn. State, 414. The opinion is both able and philosophic. Says AGNEW, C. J.: "Insanity is a defense. It presupposes the proof of the facts which constitute a legal crime, and is set up in avoidance of punishment. Keeping in mind, then, that an act of willful and malicious killing has been proved, and requires a verdict of murder, the prisoner, as a defense, avers that he was of unsound mind at the time of the killing, and incapable of controlling his will; and therefore that he is not legally responsible for his act. . . . Soundness of mind is the natural and normal condition of men, and is necessarily presumed; not only because the fact is generally so, but because a contrary presumption would be fatal to the interests of society. No one can justly claim irresponsibility for his act contrary to the known nature of the race of which he is one. He must be treated and be adjudged to be a reasonable being, until a fact so abnormal as a want of reason positively appears. It is, therefore, not unjust to him, that he should be so conclusively presumed to be, until the contrary is made to appear on his behalf. To be made so to appear to the tribunal determining the fact, the evidence of it must be satisfactory, and not merely doubtful, as nothing less than satisfaction can determine a reasonable mind to believe a fact contrary to the course of nature." To the same effect are *The State v. Smith,* 53 Mo. 267; *People v. McDonnell,* 47 Cal. 134; *State v. Lawrence,* 57 Me. 574; *Leoffner v. The State,* 10 Ohio St. 599; *State v. Starling,* 6 Jones, N. C. 366; *State v. Felter,* 32 Iowa, 50; *McKenzie v. The State,* 26 Ark. 332; Wharton on Hom. § 665; 2 Greenl. Ev. § 373. Mr. Wharton, in his work on Homicide, § 666, classes New York among the States that hold insanity is a defense, the affirmative proof of which rests with the defendant. The question, we think, is somewhat unsettled there.—*Flanagan v. People,* 52 New York, 467.

There are respectable authorities to the contrary, but we decline to follow them. We hold, then, that insanity is a defense which must be proven to the satisfaction of the jury, by that measure of proof which is required in civil causes; and a reasonable doubt of sanity, raised by all the evidence, does not authorize an acquittal. The doctrine we have been combating is, we think, purely American; and we regard it as an erroneous application of the principle of presumed

innocence. One disputable presumption should not be allowed to override and annihilate another.

Under the rules above declared, the entire affirmative charge of the Circuit Court is free from error. Of the charges asked by defendant, those numbered 1, 2 and 3 were abstract, there being no evidence to support them; those numbered 4, 5, 6, 10, 11, 12, 13, were all rightly refused, under the principles we have declared above; charges 6, 7 and 8 were calculated to mislead the jury, if they were not abstract, and were rightly refused; the two charges given at the instance of the prosecution, are free from error; and the judgment of the Circuit Court must be affirmed.

It is therefore ordered and adjudged that, on Friday, the eleventh day of June, 1880, the sheriff of Talladega county execute the sentence of the law, by hanging the said George Boswell by the neck until he is dead.

BRICKELL, C. J., dissenting.