551 So.2d 1094 (1988)
Quang Ngoc BUI
v.
STATE.
3 Div. 557.
Court of Criminal Appeals of Alabama.
April 12, 1988.
Rehearing Denied August 23, 1988.
*1098 Richard D. Shinbaum and William K. Abell, Montgomery, for appellant.
Don Siegelman, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
PATTERSON, Judge.
Appellant, Quang Ngoc Bui, was indicted on April 9, 1986, in a three-count indictment, for the capital offense of murder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct, ง 13A-5-40(a)(10), Code of Alabama 1975. At arraignment, he pleaded not guilty and not guilty by reason of insanity. On June 12, 1986, a jury found him guilty of the capital offense charged in the indictment. A sentencing hearing was held before the jury, in accordance with งง 13A-5-45 through -46, and the jury, by a vote of ten to two, returned an advisory verdict recommending that the penalty be death. This verdict was in accordance with ง 13A-5-46(f), which requires that an advisory verdict recommending death be based upon a vote of at least ten jurors. Thereafter, the trial court held another sentencing hearing, in accordance with งง 13A-5-47 through -52 and, after weighing the aggravating and mitigating circumstances and considering the jury's recommendation, sentenced Bui to death.[1]
This case arises out of an incident which occurred around midnight on the night of February 5-6, 1986, at appellant's residence, located at 3081 Simmons Road in Montgomery. Around midnight, Montgomery uniformed police officers, in response to a disturbance call, went to appellant's residence. Appellant's estranged wife had become concerned about the safety of her children, who were with appellant, and had asked the police to check on them. Upon arriving at the residence, the officers knocked on the door and, after considerable delay, appellant's mother-in-law, who also lived at the residence, opened the door. The officers told her that they wanted to talk with appellant and see the children. The mother-in-law went to notify appellant and, after some delay, returned to the door without appellant. The officers insisted on seeing him and the children, and the mother-in-law tried again, without success, to get appellant to come to the door. Finally, at the insistance of the police, the mother-in-law admitted the officers to the residence, and the officers entered appellant's bedroom, where they discovered appellant and the bodies of his three children, Phi Ngoc Bui (age 8), Julie Quang Bui (age 7), and April Nicole Bui (age 4), lying on the bed.
The first officer in the room observed a large kitchen-type knife beside appellant on the bed. As the officers approached appellant, he seized the knife and struck at the officers three times before the officers were able to take the knife away from him. The three children were dead, and their bodies were covered with blood. Each child's throat had been cut. The fatal wounds were remarkably similarโan incision on the right side of the neck of each child, which severed the jugular vein and caused the child to bleed to death. Appellant had cuts on each side of his neck, and on one side, the jugular vein had been "nicked." Although appellant was bleeding, the wounds were not life-threatening. Appellant's wounds were self-inflicted. At first, appellant refused medical assistance, and he was restrained with handcuffs so that the paramedics could administer first aid. Appellant was transported to the hospital, *1099 where he received further treatment and stitches. While at the hospital, appellant asked an officer if his wife were coming, and when the officer said that he did not know, appellant said: "I cut my kids. I didn't want her to get them." He also stated several times that he wanted to "die with [his] babies." After being treated at the hospital, appellant was released to the police and transported to police headquarters. Shortly after arriving at police headquarters and being advised of his rights, in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), appellant made a statement admitting that he killed the children because he was mad at his wife and did not want her to have them.
The record discloses that Mr. and Mrs. Bui had experienced marital difficulties for several years. There had been several separations, and appellant suspected that his wife was seeing other men. At the time of the murders, Mrs. Bui had been absent from the home for two days and, during part of this time, she was in the company of a male friend. During the two days preceding the murders, Mrs. Bui called appellant several times on the telephone, and during these telephone conversations, appellant urged his wife to return home and made threats implying that if she did not, she might never see him and the children alive again. One such call occurred at approximately 11:00 on the night of the murders. Appellant told Mrs. Bui she would have to get there within 15 minutes if she wanted to see the children alive again. During this conversation, Mrs. Bui heard one of the children crying in the background. Shortly after this call, Mrs. Bui called the Montgomery Police Department to have someone check on the children. After waiting 15 minutes, appellant "lost his temper," he said in a confession, and killed the children.
Appellant did not testify at any stage of the proceedings. He presented witnesses who testified that he was a "hard worker" and supported his family. Mrs. Bui testified that he was a loving and caring father; however, on cross-examination, she stated that he had a violent temper and had threatened to harm her and the children on numerous occasions during the marriage. Mrs. Bui also testified, on cross-examination, that appellant admitted to her that he killed the children because he was mad at her for not coming home and because he thought she was "running around on him." The fact that appellant killed the children is not disputed. Appellant's theory of defense, as disclosed in the opening statements of his counsel, was two-fold: (1) appellant is guilty of manslaughter instead of capital murder because the acts were caused by a sudden heat of passion caused by legal provocation, or (2) appellant was insane at the time of the killings. Appellant presented the testimony of a psychiatrist and a "cross-cultural" counselor in support of his insanity plea.
He raises 14 issues on appeal. We will address each issue in the order that it appears in appellant's brief.

I & II
Appellant first contends that the state committed reversible error by failing to prove the identity of the three children. He argues that the only evidence presented to show the identity of the victims was inadmissible hearsay. We do not agree. The law is clear that a homicide victim's identity can be established by circumstantial evidence. Todd v. State, 472 So.2d 707 (Ala.Cr.App.1985); Dolvin v. State, 391 So.2d 666 (Ala.Cr.App.1979), aff'd, 391 So.2d 677 (Ala.1980). Taking into consideration the locality of the crime, the proximity of appellant to the victims when discovered, the testimony of the witnesses regarding statements appellant made at the scene and at the hospital, and the confession of appellant, in which he admitted killing his three children, we think there was sufficient evidence from which the jury could have concluded beyond a reasonable doubt that the corpses were those of the Bui children. We also note that appellant's counsel admitted in his opening statement that it was the three Bui children who had been killed and named them. It cannot be seriously contended that the state failed to prove the identity of the victims, as *1100 alleged in the indictment. It did, without a doubt. The corpus delicti was proven. Appellant's contention to the contrary is without merit.

III
Appellant next contends that there was no evidence to refute the evidence of his insanity at the time he committed the killings. He argues that the evidence of insanity was so overwhelming and uncontradicted that it overcame the presumption of sanity and entitled him to a directed verdict of not guilty by reason of insanity. We disagree.
"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Ala. Code (1975), ง 13A-3-1(a).
By statute, there is a presumption of sanity extending to all persons over the age of 14. ง 15-16-2. The presumption of sanity relieves the state of any affirmative duty to prove that the defendant was, in fact, sane and responsible for his actions, until evidence to the contrary is produced and the presumption of sanity is rebutted. Cunningham v. State, 426 So.2d 484 (Ala. Cr.App.1982). Although the presumption of sanity can be overcome or rebutted, the accused is not entitled to a directed verdict on the issue of insanity unless the evidence of insanity is clear, overwhelming, and undisputed. Boyle v. State, 229 Ala. 212, 154 So. 575 (1934); Westbrooks v. State, 492 So.2d 1023 (Ala.Cr.App.1984); Cunningham v. State; Graham v. State, 383 So.2d 892 (Ala.Cr.App.), cert. denied, 383 So.2d 895 (Ala.1980). Insanity is an affirmative defense which must be proven by the defendant to the reasonable satisfaction of the jury, and the burden of proof never shifts to the state but remains on the defendant throughout the trial. Grammer v. State, 239 Ala. 633, 196 So. 268 (1940); Cunningham v. State. In making its determination on the issue of insanity, the jury may reject all expert testimony, even though it is without conflict. Christian v. State, 351 So.2d 616 (Ala.Cr.App.1976), rev'd. on other grounds, 351 So.2d 623 (Ala. 1977). In Anderson v. State, 209 Ala. 36, 40, 95 So. 171, 175 (1922), our supreme court stated the following:
"The opinions of medical men, under a plea of insanity, are by no means binding on juries even when such experts have had ample opportunity to observe the character and phenomena of defendant's disease; such opinions being admitted to be weighed with the other evidence; and, if the whole evidence does not clearly prove to the reasonable satisfaction of the jury that insanity (such as is recognized to excuse crime) existed at the time the act was done, the jury may find the defendant guilty (if the other facts warranted that verdict), although the medical witnesses were of the opinion that the prisoner was insane at the time of the commission of the offense."
A jury's verdict cannot be labeled arbitrary or patently erroneous if the jury had ample facts from which to draw an inference that the accused was in fact sane even if all the expert testimony was that he was insane; however, the testimony of experts cannot be arbitrarily rejected or ignored. Cunningham v. State; Bullard v. State, 408 So.2d 164 (Ala.Cr.App.1981), cert. denied, 408 So.2d 167 (Ala.1982).
In support of his insanity plea, appellant called as a witness Dr. Marina S. Tulao, a psychiatrist. Dr. Tulao testified that he obtained his medical degree from Santo Thomas University in the Phillippines; that he practiced medicine in the Phillippines before coming to the United States; that he completed residency in psychiatry at the University of Tennessee in Memphis; that his specialties were in general and child psychiatry; that he practiced six months in Mississippi before coming to Alabama; that he was a staff psychiatrist at Bryce Hospital for two years; that he was currently doing consultant work for the State Department of Corrections, in addition to private practice; that he was currently a member of the State Lunacy Commission at Taylor Hardin Secure Medical Facility; that he was licensed to practice psychiatry *1101 in the State of Alabama; that he had practiced psychiatry for six years; that he was not "board certified"; that while working for the State, he had conducted at least ten mental examinations of persons charged with crimes; and that this instant examination and his testimony were his first at the behest of a defendant. Dr. Tulao's expert opinion as to the mental condition of appellant at the time of the commission of the crime was primarily based upon what appellant told him during two interviews, each lasting 30 to 35 minutes. One interview was conducted in the hallway of the county jail and the other in an office at the jail. According to Dr. Tulao, during his interviews with appellant, appellant expressed no sympathy for his wife, but stated that he loved his children and was afraid someone might take them away from him. Appellant denied to Dr. Tulao that the children were dead and said they were alive and with him. Dr. Tulao stated that appellant was sad, lonely, and depressed and wanted to see his family in Vietnam. He further testified that appellant stated that he had nightmares about the Vietnamese war; that he had trouble sleeping; that he had headaches; that his appetite was poor; that he had no energy; that he felt worthless; that he had contemplated suicide; and that, just before the incident, he heard voices telling him to "do it." He told Dr. Tulao that every time he heard dogs barking, he thought someone was after him and the children.
Dr. Tulao gave his opinion that appellant was suffering from an acute psychotic reaction or depreciation at the time of the killings. He also noted that appellant had ceased going to work two weeks prior to the incident. He expressed the opinion that appellant, at the time of the incident, was unable to appreciate the consequences of his actions, could not distinguish between right and wrong, was out of touch with reality, and lacked the substantial capacity to appreciate the criminality of his conduct.
On cross-examination, Dr. Tulao testified that other psychiatrists might disagree with his diagnosis; that he did not conduct any psychological tests in evaluating appellant; that he did not talk with the police, Mrs. Bui, or appellant's employer or familiarize himself with the evidence of the case; that he did not attempt to corroborate any of the information given to him by appellant; and that his conclusion was primarily based upon what appellant had told him during the interviews. Dr. Tulao further testified that he did not administer psychological tests to appellant because of cultural differences and because he felt that the tests were "geared toward westerners not Asians," but chose instead to rely on the interviews. He stated that appellant was sane at the time of the interviews, and that, in his opinion, the psychotic condition came and went. He admitted that he had never actually seen appellant in a psychotic condition. He denied any knowledge of literature on the subject of bias on the part of the psychiatrist conducting interviews. In his pre-trial written report, he had stated that appellant was suffering from acute psychotic reaction at the time of the interviews, but his oral testimony was to the contrary, and he amended his report from the witness stand. Dr. Tulao admitted that appellant could have been lying during the interviews, and he was unable to explain why he did not attempt to verify appellant's claims.
Dr. Quan Cao was called by appellant as an expert witness. He had a master's degree in linguistics from the University of Saigon and a doctorate in "cross cultural counseling" from Florida State University. He testified that his doctorate included training in the fields of psychology, sociology, and anthropology and that, for seven years, he trained health and social personnel for the United States government in how to work with Southeast Asian refugees. He did not hold himself out as a psychologist, was not licensed as such, and admitted that he did not possess the qualifications to pass upon the sanity of appellant. He interviewed appellant on three occasions, once on the telephone prior to trial and twice in person during breaks in the trial. He stated that the purpose of the interviews was "to determine to what extent Mr. Quang's actions were dictated by *1102 cultural misunderstanding." In addition to talking with Mrs. Bui, he examined appellant's confession, listened to the tape recording of the confession, read the deposition of appellant's mother-in-law, and read letters to appellant's "sponsors." He looked for "stressors" and signs of "survivor's guilt," such as hyperalertness, lack of sleep, nightmares, changes in work and eating habits, and things that occurred in the family system. He learned, from appellant, that appellant had left Vietnam involuntarily, had not heard from his family members in 11 years, and could not write to them for fear of reprisals against them by the Communists. He concluded that appellant's problem centered around missing his family and his obsession with his wife's "running around." Dr. Cao testified that appellant talked about taking his children to Vietnam and that it appeared that he was not clear in his mind that his children were dead. Dr. Cao also concluded that appellant was depressed because he had seen a movie about the Vietnamese was just prior to the incident. He discussed the differences in the cultures and societies of the United States and Vietnam. He concluded that appellant was depressed and concerned about "saving face" and the "loss of face" stemming from the conduct of his wife. He concluded that the attempted suicide was a "face saving measure," understandable under the Asian culture of his homeland, and not irrational, but possibly a conscious act. He testified, as follows:
"Q. Doctor, to be clear for me, are you suggesting by your testimony that Quang Bui killed his children out of his sense of shame because of what his wife did?
"A. That's what I was trying to determine through my different interviews with him. Now, there's a question of rationality involved. There's a question of how much aware he was of what he was doing. And in my mind, on one level, it wasโhe wasโit was that it was a conscious act, that he has been brought to shame, and there is something he needs to do about that shame in terms of trying to kill himself and the children. On the other hand, it was not that conscious of an act because it also involved the missing of the family, the hearing of different noises that evening, the nightmares, and something that's been going on for the last three to four years. So it's a combination of different factors and it's not as simplistic as we put it to be.
". . .
"Q..... Have you ever known in the Vietnamese culture any single act of murder or homicide of children by an aggrieved father who has found out he has an adulterous wife?
"A. Yes. In Vietnam; yes. Not in the U.S. that I'm aware of.
"Q. But in Vietnam, that has occurred?
"A. (Nods head to indicate the affirmative.)
"Q. Where [sic] there in your time in Vietnam criminal laws to deal with that situation?
"A. Not that I know of."
Finally, Dr. Cao conceded that, from his interviews and study of appellant's case, he had drawn no conclusions. He testified, as follows:
"Q. So basically, the best that you can do and testify as a cross cultural expert, your expertise in that area, the only thing you can do for lack of scientifically validated test data is to draw conclusions based on assumptions; isn't that right?
"A. I've not drawn any conclusions...."
The state called Dr. Karl Kirkland, a psychiatrist, in rebuttal. He had not examined appellant, and his testimony, which was very limited, consisted of an attempt to discredit the methods used by Dr. Tulao in conducting the psychiatric evaluation and to contradict Dr. Tulao's testimony concerning available literature on the subject.
As we have heretofore said, insanity is an affirmative defense which must be proven by the defendant to the reasonable satisfaction of the jury, and the burden of proof of that issue never shifts to the state, but remains on the defendant throughout the *1103 trial. The Alabama Supreme Court stated in Boswell v. State, 63 Ala. 307, 326, 35 Am.Rep. 20 (1880), the following:
"`Soundness of mind is the natural and normal condition of men, and is necessarily presumed; not only because the fact is generally so, but because a contrary presumption would be fatal to the interests of society. No one can justly claim irresponsibility for his act contrary to the known nature of the race of which he is one. He must be treated and be adjudged to be a reasonable being, until a fact so abnormal as a want of reason positively appears. It is, therefore, not unjust to him, that he should be so conclusively presumed to be, until the contrary is made to appear on his behalf. To be made so to appear to the tribunal determining the fact, the evidence of it must be satisfactory, and not merely doubtful, as nothing less than satisfaction can determine a reasonable mind to believe a fact contrary to the course of nature.' ...
"... We hold, then, that insanity is a defense which must be proven to the satisfaction of the jury, by that measure of proof which is required in civil causes; and a reasonable doubt of sanity, raised by all the evidence, does not authorize an acquittal."
Where the whole evidence does not satisfy the minds of the jury that the accused is insane at the time of the commission of the act with which he is charged, the jury shall convict the defendant, notwithstanding that the medical witnesses were of the opinion that such person was insane. Anderson v. State; Cunningham v. State. The manner in which the act was planned, executed, or concealed may indicate such a consciousness of guilt and awareness of criminality that the question of sanity was for the jury even though all the expert defense testimony indicated that the defendant was insane. Boyle v. State; Cunningham v. State.
"The rule is fully settled with us that opinion evidence, even of experts, and in insanity cases, is to be weighed by the jury, and its probative force in overcoming the presumption of sanity, as a rule, is for them. Parrish v. State, 139 Ala. 16, 36 So. 1012; Anderson v. State, supra.
"This does not mean, however, that the jury may arbitrarily ignore or reject such testimony. Such evidence is admitted upon the ground that men who have given great study and had much experience are more competent than the layman to form a correct opinion on the question of sanity. It is illogical to say the layman in the jury box may lightly set up his own opinion to the contrary. But the juror must determine first whether the hypotheses on which the expert opinion is based are proven in substance and effect, and then weigh the expert evidence in connection with other evidence, indulging the presumptions the law declares."
Boyle v. State, 229 Ala. at 224, 154 So. at 586.
In weighing the probative value of the expert's testimony in the instant case, the jury was entitled to consider that the psychiatrist and "cross cultural" expert interviewed appellant several months after the killings, for very short periods of time, and under less than favorable conditions. A telephone interview and a short interview in the hallway of a jail do not appear to us to be the most desirable ways to conduct a psychiatric evaluation. "The opportunity for study and observation of the person whose sanity is questioned are important factors the jury should consider in evaluating the weight to be accorded an expert's opinion." Cunningham v. State, 426 So.2d at 491; Farley v. State, 34 Ala.App. 54, 37 So.2d 434, cert. denied, 251 Ala. 391, 37 So.2d 440 (1948).
Moreover, the lack of underlying data and logic to support the diagnosis of the psychiatrist is obvious. Recognized authorities in this field generally emphasize the importance of: (1) reviewing virtually all police reports and other legal documents related to the alleged offense; (2) interviewing any individuals who were in contact with the defendant in the period of time just before, during, and after the alleged *1104 offense, or reviewing written statements by these individuals; (3) interviewing family members and friends; (4) reviewing criminal justice and mental health system records of the defendant's life prior to the event; (5) reviewing jail and/or hospital ward notes and records concerning the defendant's incarceration between the time of arrest and the assessment and during the period of time over which the assessment occurs; (6) interviewing the defendant over many hours, especially to reconstruct the events surrounding the offense, the defendant's mental state before and during the offense, and their relation to each other; (7) interviewing the defendant's attorney (if appropriate with regard to the expert's role in the case) to obtain information from other sources, of which the expert might not be aware, as well as from the attorney's direct observations of the defendant, and (8) performing neurological, psychological, and/or neuropsychological testing when such information may address specific questions raised by data from other sources. T. Grisso, Evaluating Competencies 165-66 (1986).
The weakness of the hypotheses on which the expert opinions were based was brought out by cross-examination. The manner in which the interviews were conducted and the lack of underlying data to support the expert opinions were probably significant to the jury and helped create a reasonable doubt of insanity. It is readily apparent that the experts in the instant case fell far short of meeting the generally accepted standards for conducting evaluations in criminal cases. Professor Weihofen, in commenting on the common deficiencies encountered in expert psychiatric testimony, observed the following:
"The opinion testified to is often not based upon sufficient scientific observation and examination. At best, an examination made while the subject is in prison is not very satisfactory, and often no really thorough physical, mental, and neurological examination or study of the case history is even attempted, the witness' opinion being based merely upon what the defendant chooses to tell about himself or what his family tells about him."
Weihofen, "An Alternative To The Battle of Experts: Hospital Examination of Criminal Defendants Before Trial," 2 Law and Contemporary Problems 419, 420 (1935).
Portions of the testimony given by appellant's expert witnesses could have been used by the jury to support its determination. The discrepancy between the psychiatrist's written report and his testimony at trial, in reference to the mental condition of appellant at the time of the interviews, could have weakened his overall testimony in the eyes of the jury. The testimony of the "cross cultural" expert contradicts, to some extent, and casts doubt upon, the testimony of the psychiatrist. Although failing to reach any firm conclusion, he advanced the opinion that the action of appellant could have been due to his culture and that it was conscious, rational, and acceptable under certain circumstances in the Vietnamese society from which he came.
There was other evidence from which the jury could have reasonably concluded that appellant was sane at the time he killed his children. Attempting suicide following the criminal act tends to show knowledge of wrongfulness, consciousness of guilt, and a concern with avoiding the legal consequences of the act. H. Weihofen, Mental Disorder as a Criminal Defense 315 (1954). Appellant's conduct immediately after the commission of the crime provided a reasonable inference of sanity. According to the officers, he was calm, coherent, and rational. He appeared to be indifferent about the results and gave a statement, to the officers, stating that he had killed his children because he was made at his wife. He admitted that he had thought about killing his children for some time prior to the event, and the manner in which he went about it reflects calm planning and deliberation. While incarcerated in jail awaiting trial, he told his wife that he was not crazy, but that "they" were going to make it appear that he was crazy. Appellant had no history of a mental disease or defect. For some time, he had exhibited signs of extreme jealousy and possessiveness *1105 and had, on occasion, when angry with his wife, threatened to harm her and the children. According to the testimony, he used the children as "pawns" in his dealings with his wife and used them to work his will with her and to keep her from leaving him.
Insanity which will excuse a crime must be the result of a "mental disease or defect." ง 13A-3-1. Emotional insanity or temporary mania, not associated with a disease of the mind, does not constitute insanity. Brackin v. State, 417 So.2d 602 (Ala.Cr.App.1982); McKinnon v. State, 405 So.2d 78 (Ala.Cr.App.1981); Johnson v. State, 43 Ala.App. 224, 187 So.2d 281 (1966).
"[W]here one does not act under the duress of a diseased mind, or insane delusion, but from motives of anger, revenge or other passion, he cannot claim to be shielded from punishment for crime on the ground of insanity. Insanity proper, is more or less a mental derangement, coexisting often, it is true, with a disturbance of the emotions, affections and other moral powers. A mere moral, or emotional insanity, so-called, unconnected with the disease of the mind, or irresistible impulse resulting from mere moral obliquity, or wicked propensities and habits, is not recognized as a defense to crime in our courts.โWhar.Cr.Law (9th ed.), ง 46; Boswell v. State, 63 Ala. 307, 35 Amer.Rep. 20; Ford v. State, 71 Ala. 385."
Parsons v. State, 81 Ala. 577, 594, 2 So. 854, 865 (1886). "High temper, hot blood, and passion, whether of an amorous nature, or arising from anger, hatred, jealousy, desire for revenge, or other emotions, will not excuse the commission of crime." 22 C.J.S. Criminal Law ง 63 (1961). "Unusual or `weird' behavior alone cannot be equated with mental incompetency or insanity." Brackin v. State, 417 So.2d at 604; Carey v. State, 361 So.2d 1176, 1179 (Ala.Cr.App.1978), cert. denied, 374 So.2d 332 (Ala.1979). In the absence of other evidence, atrocity does not of itself furnish any basis for the defense of insanity. State v. Wallace, 170 Or. 60, 131 P.2d 222 (1942). H. Weihofen, Mental Disorder as a Criminal Defense 314, n. 14. From the evidence in the instant case, the jury could reasonably have concluded that appellant murdered his children from motives of anger, revenge, and jealousy toward his wife, and not from the duress of a mental disease or defect. "The fact that the defendant was `insanely jealous,' a species of emotional insanity, would not relieve him from responsibility. Brown v. State [142 Ala. 287] 38 South. 268." Barnett v. State, 39 So. 778, 780 (Ala.1905). If the crime were motivated by a desire to "save face," as was suggested by Dr. Cao, this could hardly be considered evidence of a mental disease or defect, regardless of the degree of humiliation appellant may have felt.
We conclude, after carefully reviewing the record, that the evidence presented in support of the plea of insanity was not so overwhelming and conclusive that the jury was compelled to find appellant insane. There was a substantial amount of evidence from which the jury could have reasonably concluded that appellant was sane at the time he murdered his three children. It was proper for the trial court to submit the issue to the jury.

IV
Appellant contends that the trial court erred in refusing to allow Dr. Quan Cao to testify as to his opinion concerning the mental condition of appellant at the time of the commission of the offense. There is no merit to this contention. Dr. Cao was permitted to testify as a "cross cultural counselor," and he testified about types of stresses that a person from a "closed" society such as Vietnam would face in adjusting to an "open" American society. He attempted to explain appellant's actions in terms of the problems appellant was having with his wife and the likely responses of a Vietnamese man in appellant's situation. Although he had had training in the fields of psychology, sociology, and anthropology, he was not a psychologist, did not represent himself as such, and testified that he did not possess the qualifications to pass upon appellant's sanity and was not testifying for that purpose. *1106 He testified that he examined appellant "to determine to what extent Mr. Quang's actions were dictated by cultural misunderstanding."
The question of whether a particular witness will be allowed to testify as an expert is largely discretionary with the trial court, whose decision will not be disturbed on appeal except for palpable abuse. Hagler v. Gilliland, 292 Ala. 262, 292 So.2d 647 (1974); C. Gamble, McElroy's Alabama Evidence ง 127.01(5) (3d ed. 1977). Appellant's counsel urged the trial court to accept Dr. Cao as an expert in psychology in spite of Dr. Cao's protestations to the contrary. There could hardly be an abuse of discretion by the trial court in refusing, under the circumstances, to permit the witness to testify as a psychologist. The trial court's ruling was correct.

V
Appellant contends that the admission of his confession made to Office E.B. Spivey on the morning following the killings constituted reversible error. He argues that, due to his physical and mental condition at the time of the police interrogation, he was unable to voluntarily, knowingly, and intelligently waive his constitutional right, and that the inculpatory statement elicited from him was involuntarily obtained. His argument is primarily based upon his assertion that he was under medication, suffering from fatigue, and insane at the time.
The evidence presented at the pre-trial suppression hearing disclosed that the officers initially arrived at the scene at 12:52 a.m., February 6, 1986; that appellant had wounds on both sides of his neck, which were not life-threatening but were bleeding; that he was conscious, alert, talking, did not appear to be in pain, and appeared to have his senses and to know what was going on; that he refused treatment and tried to keep the paramedics from looking at the wounds on his neck; that he appeared to be in a "weakened" condition; and that he was upset at his wife. Appellant asked Officer Allen Greenwood, one of the first officers on the scene, if appellant's wife was there and stated that the "kids had to go with him." Appellant stated to Officer J.H. Hannah, another of the first officers on the scene, "Tell my wife goodbye." When Officer Hannah went into the bedroom, he asked appellant about his children, and appellant stated, "They had to go with me." Handcuffs were placed on appellant at the scene to restrain him, so that he could be treated for his wounds. He was given an "I.V." at the scene, and after walking from the bedroom, was transported by ambulance to the hospital, arriving there at approximately 1:20 a.m. Enroute to the hospital, he gave his age and date of birth to the ambulance attendants. He also stated, in the ambulance, that he wanted to die with his children. The doctor in the emergency ward of the hospital asked him if he had cut himself, and he answered "Yes." He asked what hospital he was in and if his wife was coming. He also said, "I cut my kids, I didn't want my wife to get them." He stated again that he wanted to "die with [his] babies." He was taken to surgery and given "general endotracheal anesthesia," and his wounds were sutured.
Appellant was released into police custody at 4:50 a.m., transported to police headquarters, and placed in an interrogation room. He drank a "Coke," smoked a cigar, and was advised by Officer Terry Jett of his rights, pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Officer Jett had been with appellant continuously since shortly after midnight, except for the brief period when appellant was in surgery at the hospital. Officer Jett delivered custody of appellant to Investigator Spivey at 6:25 a.m. Spivey again advised appellant of his Miranda rights from a form and explained them to appellant; appellant acknowledged that he understood his rights; and appellant signed an acknowledgement that he had been advised of his rights and a waiver stating that he understood the rights and was willing to answer questions. Spivey had appellant read aloud the acknowledgement and waiver; appellant stated that he understood them, and he signed them. Spivey determined that appellant was sufficiently fluent in English to understand his rights. He explained to appellant that if he *1107 did give a statement, it could and probably would be used against him in court. At this time, appellant was conscious, alert, and talking, and did not appear sleepy or physically weak. Appellant was not threatened or coerced in any manner, and no promises were made to him. He was immediately responsive and began to tell the story at once. Spivey furnished appellant water, soft drinks, and cigarettes and gave him opportunities to go to the restroom. He was allowed to stand up and stretch himself during the interrogation, and the handcuffs were removed.
During the interview, in addition to talking about the crime, he talked about Vietnam and his service as a fighter pilot in the Vietnamese navy. After talking with Spivey at length about the killings, appellant consented to give a formal statement, which was tape-recorded and later reduced to writing. Both the tape recording and the written statement were admitted into evidence. The statement is in "question and answer" form. The taped interview began at 9:03 a.m. and ended at 9:47 a.m. After the statement was reduced to writing, appellant read it to himself and again "out loud," and stated to Spivey that the statement reflected what he had said. He also stated to Spivey that Spivey had not tried to "fool him." Appellant signed at the bottom on each of the eight pages of the statement. Appellant signed the statement between 10:30 and 11:00 a.m. In the statement, appellant admitted killing his children. He stated that his wife had left him; that she was "running around"; and that, after several telephone conversations with her, he lost his temper and killed his children.
After the interrogation, appellant was transported to the jail, arriving there at 2:15 p.m. The doctors at the hospital had not provided any medication for him, but gave an instruction that he should return the next day to have the wound dressing changed. After the dressing was changed the following day, appellant did not see the doctor again for a week. Apparently, no complications arose as a result of his wounds. The "I.V.," which he had received at the scene and in the ambulance, was a "blood replenisher" and contained no drugs or medication. Appellant did not complain of any pain during the interrogation.
Appellant did not testify at the suppression hearing. In fact, the officers' testimony concerning the circumstances surrounding the taking of the confession stands unrefuted.
The oft-stated rule is that a confession is prima facie involuntary and inadmissible, and the state must show voluntariness and a Miranda predicate in order for it to be admitted. Thomas v. State, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976); Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). Whether there was a waiver of the right to remain silent and the right to counsel and whether it was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of accusedโthe totality of the circumstances. Thomas v. State; Magwood v. State; Chandler v. State, 426 So.2d 477 (Ala.Cr. App.1982) (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parte Singleton, 465 So.2d 443 (Ala.1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id. The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Magwood v. State; Marschke v. State, 450 So.2d 177 (Ala.Cr.App.1984). Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Chambers v. *1108 State, 455 So.2d 1008 (Ala.Cr.App.1984); Bennett v. State, 409 So.2d 936 (Ala.Cr. App.1981), cert. denied, 457 U.S. 1137, 102 S.Ct. 2968, 73 L.Ed.2d 1356 (1982). The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Ex parte McCary, 528 So.2d 1133 (Ala. 1988); Ex parte Singleton. The fundamental requirements for voluntariness are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him. Martin v. Wainwright, 770 F.2d 918 (11th Cir. 1985), modified on other grounds, 781 F.2d 185 (11th Cir.), cert. denied, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986); Jurek v. Estelle, 623 F.2d 929 (5th Cir.1980) (en banc), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); Magwood v. State; Harris v. State, 420 So.2d 812 (Ala. Cr.App.1982). We, therefore, look to the totality of the circumstances surrounding appellant's statements to determine whether the record supports the finding of the trial court and the admission of the statements into evidence.
A review of the evidence in the instant case leads us to the conclusion that, contrary to appellant's assertions, he was not suffering from a life-threatening wound, was not in pain, and was not under medication or fatigued to such an extent that any of these conditions would have adversely affected his ability to waive his constitutional rights and give a voluntary statement. In arguing that he was not mentally competent at the time of the interrogation, appellant places much weight on a statement or form signed by the doctor in the hospital emergency room. This form states that appellant was physically and/or mentally unable to consent to medical treatment. This statement is merely an administrative procedure followed by the hospital for its protection when a patient refuses to sign the consent form for treatment in the emergency room, and it does not constitute a finding concerning the mental condition of appellant. Appellant was not given a mental examination in the hospital, and the emergency room doctor did not intend, nor did he give, an opinion on appellant's mental condition. There was no substantial evidence presented at the suppression hearing to support appellant's contention that his statement was inadmissible due to mental incompetency. We have listened to the tape recording of the confession, as did the trial court, and we find nothing therein which indicates to us that appellant was on medication, in pain, fatigued, overborne, sleepy, or lacking the mental capacity to understand what he was saying and doing. It is true that there were, in some instances, long pauses between questions and answers, but this indicates to us a careful consideration of the questions before responding.
We have thoroughly reviewed the totality of the circumstances surrounding the confession, and we are convinced that the confession was voluntarily given after a knowing and intelligent waiver of appellant's Fifth Amendment rights. The trial judge's admission of the confession into evidence was not contrary to the great weight of the evidence and, therefore, should not be disturbed on appeal.
The inquiry of Officer Hannah at the scene whereby he asked appellant about his children did not constitute interrogation or violate the Miranda rule, and the response of appellant that his children had to go with him was admissible. The questioning was in the nature of a general on-the-scene investigation. Miranda does not prevent traditional investigatory functions such as general on-the-scene questioning. See also United States v. Scalf, 725 F.2d 1272 (10th Cir.1984); Truex v. State, 282 Ala. 191, 210 So.2d 424 (1968). Other statements by appellant at the scene, in the ambulance, and at the hospital were volunteered, spontaneous, and not the result of questioning by the police and, thus, were admissible even though Miranda warnings had not been given. Crawford v. State, 479 So.2d 1349 (Ala.Cr.App.1985); Magwood v. State.

*1109 VI & VII
Appellant contends that the trial court's finding that the capital offense for which he was convicted was especially heinous, atrocious, or cruel compared to other capital offenses was not supported by the evidence. He relies on the holding in Ex parte Kyzer, 399 So.2d 330 (Ala.1981), that the aggravating circumstance listed in ง 13A-5-49(8) (formerly ง 13-11-6(8))โ that the capital offense was especially heinous, atrocious, or cruel compared to other capital offensesโ"was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." 399 So.2d at 334.
Appellant's contention that the children were killed while they slept is not supported by the record. By his own admission, appellant dressed the children in their best clothes before he killed them, and when asked by Spivey if the children said anything when they were cut, appellant stated, "They said it hurt." The children did not die quickly and peacefully in their sleep, as appellant argues. The medical testimony discloses that each child slowly bled to death, and the time from the severing of the jugular vein to death could have been as long as 30 minutes. The children would not have lost consciousness until a substantial amount of blood had drained away from their heads and faces, which could have taken as much as five minutes or more. Each child must have experienced prolonged pain and terror before losing consciousness. One can only imagine the torture each child experienced by watching their father methodically cut the throats of each of them in the presence of the others and to allow them to slowly and painfully bleed to death. The evidence here amply supports the conclusion that these murders were conscienceless, pitiless, and unnecessarily torturous to the victims. The evidence amply supports the finding of the trial court.

VIII
Appellant contends that the prosecutor's argument before the jury during the sentencing phase of the trial was improper. He does not point out the specific parts of the argument he finds objectionable. He apparently objects to those comments dealing with the circumstances of the killings and whether they were heinous, atrocious, or cruel compared to other capital offenses. It also appears that he is objecting to that portion wherein the prosecutor suggested that the children struggled prior to being killed. We note that the trial court sustained appellant's objections to the argument suggesting that a struggle occurred. However, we do not believe that the argument was improper under the circumstances. A prosecutor may state or comment on proper inferences from the evidence and may draw conclusions from the evidence, based upon his own reasoning. Sasser v. State, 494 So.2d 857 (Ala. Cr.App.1986). It is reasonable to infer, from the evidence, that the children put up a struggle to prevent their throats from being cut, particularly the eight-year-old son. It seems unreasonable that they would have passively submitted. Some of the children's blood was found on appellant's clothing. An indication that they struggled while appellant held them with his knees is the fact that their blood was found on the knees of his pants. Moreover, the fact that Mrs. Bui heard, over the telephone, the children crying supports this inference of a struggle. We have examined the prosecutor's entire argument, and we find nothing therein to warrant a reversal of this case.
We note that the trial court sustained appellant's objections to the prosecutor's argument. The general rule is that prejudicial statements, even though improper, are considered capable of being eradicated by the trial court in sustaining objections thereto or by appropriate instructions to the jury or both. Meredith v. State, 370 So.2d 1075 (Ala.Cr.App.), cert. denied, 370 So.2d 1079 (Ala.1979). Assuming that any comment was improper, we believe that the sustaining of appellant's objections, in this instance, was sufficient to eradicate any possible prejudice to appellant. We do not believe that additional curative instructions were necessary, and *1110 the court's failure to give such was not erroneous.

IX
Next, appellant contends generally that the trial court committed error by limiting his right to propound voir dire questions to the jury venire. He does not identify specific questions refused; rather, he identifies them generally as questions dealing with insanity, cultural differences, and child abuse.
"`In the process of selecting the jury from the venire afforded, each party has the right to have questions formulated by it propounded to the jury, either by the court or by the party as the court may determine, if such questions reasonably relate under the circumstances to the question of the qualification or interest or bias on the part of prospective jurors.' Griffin v. State, 383 So.2d 873, 876 (Ala.Cr.App.), cert. denied, 383 So.2d 880 (Ala.1980), quoted with approval in Alabama Power Co. v. Bonner, 459 So.2d 827, 833 (Ala.1984)."
Heath v. State, 480 So.2d 26, 28 (Ala.Cr. App.1985). It is well settled that the trial court has discretion regarding how the voir dire examination of the jury venire will be conducted, and that reversal can be predicated only upon an abuse of that discretion. Ervin v. State, 399 So.2d 894 (Ala.Cr.App.), cert. denied, 399 So.2d 899 (Ala.1981); Peoples v. State, 375 So.2d 561 (Ala.Cr.App. 1979).
We have examined the complete voir dire of the jury in the instant case and the questions submitted to the trial court by appellant, including those given and those not given, and we conclude that there was no abuse of discretion by the trial court in the manner in which the voir dire proceedings were conducted.

X
Appellant contends that the state failed to prove that the bodies autopsied by Dr. Allen Stillwell, a medical examiner with the State Department of Forensic Sciences, were the same bodies removed from the crime scene and that the bodies were in the same condition when autopsied as when discovered at the crime scene.
Dr. Stillwell photographed each body, and the photographs were admitted into evidence. The jury had seen a video tape showing the bodies and had heard testimony concerning their identities. The jury itself could have determined that the bodies in Dr. Stillwell's photographs were the same as those shown in the video tape. Moreover, Officer Spivey identified photographs of the three children taken at the scene, compared them with photographs of the children's bodies taken at the time of the autopsies, and testified that they were the same children. We find that, upon the evidence, the state proved that the bodies autopsied were the Bui children.
At the beginning of Dr. Stillwell's testimony, appellant offered the following stipulation: "If he is going to testify as to the deaths occurring from knife wounds on the necks of the three subjects, we will stipulate that." This, apparently, is an admission by appellant that the persons, whose bodies were found at the scene, died as a result of knife wounds to the neck. By this offered stipulation, appellant waived the argument that it was not shown that the bodies, when autopsied, were in the same condition as when found at the crime scene. Any intervening change in the condition of the bodies would have only related to the medical examiner's ability to determine the cause of death. Because appellant offered to stipulate the cause of death, he should not now be allowed to complain that there could have been a change in the condition of the bodies.
As we have previously stated, appellant does not contend that he did not kill his three children by cutting their throats. There can be no doubt but that the three children examined by Dr. Stillwell were the Bui children. We find no merit to appellant's contentions.
Appellant argues that Dr. Stillwell's identification of the children is based upon hearsay. Although Dr. Stillwell did not personally know the Bui children, the bodies apparently carried some type of *1111 identification when he received them. The trial court permitted Dr. Stillwell to identify each child by name and state the cause of death. This testimony was admitted for the sole purpose of identification and not for the truth of the matter asserted, and the jury was so instructed. This ruling was proper. A statement which is useful in identifying a person, time, place, or other thing is admissible for that purpose as a hearsay exception. C. Gamble, McElroy's Alabama Evidence ง 273.01 (3d ed. 1977); 6 Wigmore, Evidence ง 1719 (Chadbourne rev. 1976).

XI
Appellant contends that the prosecutor's closing argument during the guilt-phase of the trial contained grounds for reversible error. He bases this contention on three portions of the argument.
The first allegedly objectionable comments were a response to argument by defense counsel. During his argument, defense counsel stated:
"[Mr. Shinbaum]: I'm going to tell you who is on trial today: Quang Ngoc Bui. Only Quang Ngoc Bui; no one else. There is an old axiom ... in law that when you don't have the facts, you try the law; when you don't have the law, you try the attorney.... And I'm not the one on trial here today for doing what is my legal responsibility. Doctor Tulao is not on trial here today."
The prosecuting attorney responded, as follows:
"[Mr. Evans]: Mr. Shinbaum referred to some adages, but I don't think he gave you a right adage. It was taught to me about fourteen years ago. The adage is: try the facts; and if the facts are against you, try the law; if the law is against you, try the police; if you can't succeed trying the police, try the district attorney; and if you can't do anything else, plead him not guilty by reason of insanity. Now, that's the complete adage.
"MR. SHINBAUM: We have an objection.
"THE COURT: Sit down. I will charge them appropriately. I will charge them that this is only argument."
While we do not necessarily approve of such comments, we do not find them to be improper in this instance. They amount to nothing more than opposing counsel accusing each other of certain tactics. We view the prosecutor's remarks as a reply in kind. Replies in kind are generally permissible, and whether to allow them rests within the discretion of the trial court. Davis v. State, 494 So.2d 851 (Ala.Cr.App.1986). We find no abuse of discretion here, nor do we find that appellant was prejudiced by the remarks.
The second portion of the prosecutor's argument to which appellant objects is as follows:
"MR. EVANS: And, you know, all of this business about we didn't ask Doctor Kirkland was the man insane, I'd have given anything in the world to ask Doctor Kirkland that, but, you know, he objected and wouldn't let me do it.
"MR. SHINBAUM: Your Honor, I object.
"THE COURT: Sustained. I made the ruling on Doctor Kirkland. I made the ruling on why you couldn't ask that question. Go ahead."
The trial court sustained appellant's objection to this argument. Moreover, the effect of the trial court's ruling was to make it clear to the jury that the argument was an improper one and, thus, that the prosecutor's argument should be disregarded. Appellant did not ask for additional instructions. If any prejudice arose as a result of this argument, we believe it was eradicated by the trial court's sustaining appellant's objection and by its comments in reference to the argument. Meredith v. State.
The third portion of the argument at issue is the statement by the prosecuting attorney implying that some of appellant's witnesses were "charlatans." The record shows the following:
"MR. EVANS: Ladies and gentlemen of the jury, this time of closing arguments *1112 is reserved for myself to come and talk to you for a moment. And my duty is to remove some of the smoke screens that have been put before you, or attempted to be put before you to keep you from seeing what's really going on. The only thing we are saying here is the very idea of the charlatan that they put on the stand to try to feed you the garbage and spoon feed it to you as they didโ
"MR. ABELL [Defense counsel]: Your, Honor, object to the characterization of that.
"THE COURT: I will instruct the jury accordingly.
"MR. ABELL: Thank you."
The prosecuting attorney obviously was referring to Dr. Tulao, the psychiatrist, and Dr. Cao, the cross-cultural expert. Their testimony was subject to criticism. Their conclusions could be questioned because of insufficient interviews and lack of underlying psychological data. Their knowledge and ability were legitimate areas of comment.
Appellant's counsel evidently interpreted the trial court's action as sustaining his objection and asked for no further relief. The argument here was not improper and, thus, no error occurred.
We have examined the prosecutor's closing argument in its entirety and find nothing in any part of the argument or in it as a whole that would constitute reversible error.

XII
Appellant contends that the indictment under which he stands convicted was returned by a grand jury from which blacks had been systematically excluded in violation of his right to equal protection of the law under the Fourteenth Amendment.
We note that this issue was not timely presented, for appellant raised it for the first time on motion for a new trial. A.R.Crim.P.Temp. 16 requires that objections based on defects in the commencement of a criminal proceeding or charge, other than lack of subject matter jurisdiction or failure to charge an offense, be raised only by pre-trial motion at or before arraignment or by such later date as may be set by the court. One such objection is discrimination in the selection of the grand jurors. See Comment, Rule 16.4, A.R. Crim.P.Temp. In non-capital cases, the failure to raise objections or defenses required by pre-trial motions constitutes a waiver thereof unless the court for good cause grants relief from such waiver. Wesley v. State, 424 So.2d 648 (Ala.Cr.App. 1982); Sanders v. State, 426 So.2d 497 (Ala.Cr.App.1982); Rule 16.2(c). The Alabama Supreme Court in Williams v. State, 342 So.2d 1328, 1330 (Ala.1977), stated:
"A defendant who has not been misled is not permitted to participate in the selection of the jury without objections, speculate on winning a favorable verdict, and, failing to do so, raise for the first time such questions on a motion for new trial."
Appellant did not meet those requirements set forth in Williams that would have established the exception for recognizing such a claim on motion for new trial. Since appellant did not properly present this issue to the trial court, we review it by the plain error standard.
Appellant bases his contention on bare allegations, unsupported by any evidence, that the grand jury was drawn from a list of jurors taken from the voters list of Montgomery County and that, pursuant to ง 182, Const. of Ala.1901, certain blacks had been unconstitutionally denied the right to register and have their names placed on the voters list because of conviction for certain crimes. Section 182 disenfranchised persons convicted of crimes involving moral turpitude. The statistics cited in argument by appellant's counsel to support his claim of disparity between blacks in the population, those excluded from the jury rolls, and those selected for jury service are themselves mere, unsupported conclusions. In an effort to support his contention, appellant moved the trial court to take judicial notice of the public records of the county, and the trial court granted the motion; however, no public *1113 records were introduced or identified and, thus, none are before us.
Appellant relies on Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), and Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). In Vasquez v. Hillery, a habeas corpus proceeding, the court found intentional discrimination in the selection of grand jurors in Kings County, California (a total absence of blacks from grand juries in the history of the county). Unlike the case before us, Hillery's claim was supported by affidavits and other evidence. In Hunter v. Underwood, a case originating in the Northern District of Alabama and seeking declaratory judgment and injunctive relief to enforce the right to register and vote, the Court held that ง 182, Const. of Ala. 1901, violated equal protection where, even though on its face it was racially neutral, its original enactment was motivated by a desire to discriminate against blacks on account of race and the provision had had a racially discriminatory impact since its adoption. The plaintiff's claim in Hunter v. Underwood was supported by substantial evidence.
From the record before us, we cannot conclude that blacks were unconstitutionally excluded from the voters list and, thereby, excluded from jury service. Appellant has totally failed to meet the burden of showing that the juror selection process systematically excluded blacks from the grand jury. Without evidence to the contrary, we must presume that the officials responsible for compiling the jury roll performed their duties, in accordance with งง 12-16-55 through -57, Code of Alabama 1975. "`There is a presumption that no legal fraud exists in the system used for the selection of jurors, in the absence of proof to the contrary, or an offer of such proof.' Nixon v. State, 291 Ala. 657, 658, 286 So.2d 315 (1973)." Wesley v. State, 424 So.2d 648, 650 (Ala.Cr.App.1982); Oyarzun v. Pittman, 367 So.2d 574 (Ala. Cr.App.1978), cert. denied, 367 So.2d 584 (Ala.1979); Ala.Digest, Criminal Law, Key No. 322. Accordingly, we find no plain error. "The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred...." Ex parte Watkins, 509 So.2d 1074, 1077 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
We find it appropriate here to quote a portion of the trial court's reasoning in denying this ground of appellant's motion for a new trial. The trial court stated, as follows:
"Well, of course, as you prefaced your argument, you said it has become public knowledge that there is some infringement on the constitutional makeup of the venire, I assume, from Montgomery County.... I would say it has become public knowledge because I have lawyers filing that type of motion all the time. I believe I have put it to rest in some previous cases. I will go ahead and state this ...: Obviously, being black and being one of the minority race, I am very sensitive to this issue. However, I have put to rest that the way of selecting jurors in Montgomery County meets the constitutional standards under Underwood and Vasquez. I have heard arguments on this particular issue, and I think the law requires that those who are qualified to vote be allowed to vote, and of course, that's being done in Montgomery County. So, obviously, being sensitive to the issue, I've paid very strict and close attention to it, and I feel that I have already put that issue to rest in previous cases. However, your objection on it for this trial is noted."
The trial court's action in overruling appellant's motion for a new trial on this ground was entirely proper.
Appellee argues, inter alia, that appellant has no standing to assert an equal protection claim based on the alleged exclusion of blacks from the grand jury, since he is not a member of the black race, but is a member of an Asian race. In view of our disposition of this contention as expressed above, we find it unnecessary to address the question of standing.

*1114 XIII
Appellant contends that the state failed to comply with the trial court's discovery orders, in violation of A.R.Crim.P. Temp. 18. We disagree. It appears from a reading of the record that there was extensive discovery between the parties and that the trial court was expressly concerned with full disclosure of all discoverable material; however, the court apparently did not issue any formal discovery orders, as there are none in the record. The only specific discovery matter raised by appellant is the prosecution's failure to disclose the existence of a taped conversation between Mrs. Bui and a police officer, which occurred shortly before the commission of the crime, when Mrs. Bui called the police station about her children. During this conversation, she told the officer who answered the telephone that she had talked with her husband a few minutes before and he had told her that he was going to kill the children and that she wanted the officers to go to the Bui home to check on them. At trial, Mrs. Bui was called as a defense witness and, on cross-examination, stated that she did not remember telling the officer that appellant had told her that he was going to kill the children. The recorded conversation was used to refresh her recollection, and she then testified that appellant had threatened the children.
Appellant contends that the taped telephone conversation should have been produced pursuant to his request for production of all statements made by appellant. This statement, of course, was not one made by appellant, but by Mrs. Bui. The statement was not one encompassed within appellant's motion for discovery, and the failure of the state to produce it did not violate Rule 18.

XIV
Appellant contends that his equal protection rights were violated when the prosecution used its peremptory challenges to strike black jurors from the venire.[2] He relies on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In order to establish a case of purposeful discrimination under Batson, the defendant must first show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove, from the venire, members of the defendant's race. Appellant is not a member of the black race, but an Asian race. He has failed to show that any members of his race were struck from the venire. Therefore, we conclude, on the basis of Batson, that appellant is without standing to raise his racial challenge at trial to the state's exercise of its peremptory challenges. Kibler v. Florida, 501 So.2d 76 (Fla.Dist.Ct.App.1987).

XV
The scope of our review in death cases is set out in A.R.A.P. 45A, as follows:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the appellant."
See also Ex parte Johnson, 507 So.2d 1351 (Ala.1986). "`Plain error' only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also United States v. Frady, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981).
*1115 A trial court has broad discretion in formulating its jury instructions, provided they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986), citing United States v. Padilla-Martinez, 762 F.2d 942 (11th Cir.1985).
"Generally, the sufficiency of instructions must be determined by the facts in each case. It is the object and office of instructions to define for the jury, and to direct their attention to, the legal principles which apply to govern the facts, proved or presumed, in the case; and hence the instructions, whether given by the court of its own motion or by request, should be full, clear, and explicit, giving to the jury all the law so far as it relates to the issues proved or claimed to be proved, if such issues are sustained by any evidence or by any legitimate inference therefrom, and giving it in such a manner that the jury may not be misled or fail to understand the real issues. Moreover, the instructions should be a safeguard of fairness and impartiality and a guaranty of judicial indifference to individuals." (Footnotes omitted.)
23A C.J.S. Criminal Law ง 1190(b) (1961). "The chief purposes of the charge are clarification of the issues, elimination of extraneous matters, and declaration and application of the law arising upon the evidence." State v. Jones, 293 N.C. 413, 238 S.E.2d 482, 490 (1977). Instructions as to legal principles unrelated to the factual situation under consideration should not be given to the jury.
In searching the record in the instant case, we notice that the trial court's instructions on the elements of the capital offense charged included, at one point, references to งง 13A-6-2(a)(2) and (3) concerning reckless murder and felony murder, respectively. These provisions are contrary to ง 13A-5-40(b) of the capital murder statute, were not applicable to this case, and should not have been included in the instructions. The question which we must now decide is whether the inclusion of these inapplicable instructions in the charge constituted plain error. There is no question that we must apply the "plain error" rule in capital cases to oral instructions to the jury. Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
The trial court gave the following charge regarding the definition of murder applicable to the capital charge:
"Now, the defendant is charged with the criminal offense of capital murder. I will now read the law to you of how the law of the State of Alabama defines capital murder. First, of course, I will read to you the law on murder as relates to thisโI will charge you on the complete section on murder and portions of it as relevant to this particular case and you are to remember the portion particularly relevant to this particular case.
"Section 13A-6-2 defines murder as follows: A person commits the crime of murder if: with intent to cause the death of another person, he causes the death of that person or of another person; or, under circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person; or three, he commits or attempts to commit arson in the first degree, burglary in the first degree or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree, or any other felony clearly dangerous to human life and in the course of and in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person.
"Now, that is the complete definition of murder. Portions of that definition perhaps will be relevant to this case and that is for you to remember what portions, based on the facts, may be relevant to this particular case.
"Now, this defendant is charged, of course, with capital murder. Section 13A-5-40 says: that one who murders two or more personsโor when two or *1116 more persons are murdered by the defendant by one act or pursuant to some scheme or course of conduct, that person then is guilty of capital murder. So, you are to take the definition of murder which is relevant to the facts of this caseโand that's for you to remember what the facts areโand then take capital murder which says: murder wherein two or more persons are murdered by the same defendant by one act or pursuant to one scheme or conduct. And you are to make your decision based on that law."
At the close of the charge, and outside of the presence of the jury, the following occurred:
"MR. EVANS [district attorney]: Two other things. In regard to reckless endangerment, under the Code, I don't think that's applicable.
"THE COURT: I read the whole statute. I told them that it was up to them to see what fits the facts of this case.
"MR. EVANS: I'm afraid of a recent case. When you charge a jury on reckless endangerment under murder and there is no such murder, it may be reversible error.
"MS. BROOKS [assistant district attorney]: To be capital, it has to be intentional.
"THE COURT: I need to charge the jury on intentional murder."
The trial court subsequently further charged the jury, as follows:
"Let me recharge you on the definition of murder that more closely and perhaps more pointedly deals with this case. 13A-6-2 reads: `A person commits the crime of murder if: with intent to cause the death of another person, he causes the death of that person or of another person.' However, a person does not commit murder under this (a)(1) of this section if he was moved to act by a sudden heat of passion caused by a provocation, recognized by law, and before there has been a reasonable time for the passion to cool and for reason to reassert itself. The burden of injecting the issue of killing under legal provocation is on the defendant, but this does not shift the burden of proof. This subsection does not applyโdoes not apply to a prosecution for, or preclude a conviction of, manslaughter or of the crime.
"Now, ladies and gentlemen of the juryโwhat says the state?
"MR. EVANS: Satisfied.
"THE COURT: Defense?
"MR. SHINBAUM: Satisfied.
"MR. ABELL: Satisfied, your Honor."
In informing the jury of the definition of the criminal act charged, the trial court used the precise language of งง 13A-6-2(a)(1), (2), and (3), defining the crime of murder in its entirety. Sections 13A-6-2(a)(2) and (3) were clearly not applicable to the facts in the instant case, but concerned reckless murder and felony murder. After reading the statute, the trial court advised the jury that it had read them the complete definition of murder, that only portions of the definition would apply to the case, and that the applicable portion must be based on the relevant facts of the case. The court then instructed the jury on the definition of the capital offense, ง 13A-5-40(a)(10). After some discussion between counsel and the court concerning the inapplicable subdivisions in the instruction given, the trial court recharged the jury, defining the specific crime of murder involved in the case, ง 13A-6-2(a)(1) and omitting the inapplicable subdivisions previously given.
It is within the discretion of the trial court, in instructing the jury, to read or to quote a statute or a part thereof, which is relevant and applicable to the case. Brackin v. State, 417 So.2d 602 (Ala.Cr.App. 1982); 23A C.J.S., supra, at ง 1192(b). An instruction in the language of the statute, which defines the offense charged, is not erroneous because the statute also includes a reference to terms indicative of another offense, at least where the jury is limited to the evidence and there is no question concerning the other offense. Ex parte Kennedy, 472 So.2d 1106 (Ala.1985); Toles v. State, 416 So.2d 768 (Ala.Cr.App.1982); Cahill v. People, 111 Colo. 29, 137 P.2d 673 (1943); State v. Hiatt, 231 Iowa 499, 1 *1117 N.W.2d 664 (1942); Daniels v. State, 68 Okl.Cr. 324, 98 P.2d 68 (1940); 23A C.J.S., supra, at ง 1194.
Where a portion of an oral charge might be erroneous or misleading, the whole charge may be looked to, and the entire charge must be construed together to see if there be reversible error. Ex parte Kennedy; Gosa v. State, 273 Ala. 346, 139 So.2d 321 (1961). Looking to the entire oral charge, we find no plain error here. The indictment charged only intentional murder, the trial court specifically limited the jury to the evidence, and there was no question concerning the other offenses. There is absolutely no evidence in the record that the murders were committed by reckless conduct or in the commission of a felony. There are no facts which could have possibly led the jury to that conclusion. Even if we conclude that the inclusion of the inapplicable portions of the charge, as initially given, was erroneous and misleading, the misleading quality was corrected by the trial court's later instruction. As a whole, the instructions properly presented the case to the jury.
We note that at the time these instructions were given, appellant made no objection. While this failure to object certainly does not preclude review in a capital case, it does weigh against any claim of prejudice. Ex parte Kennedy; Bush v. State, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).

XVI
In accordance with A.R.A.P. 45A, we have examined the instant record for any plain error, whether or not brought to our attention or the attention of the trial court. We have found no "plain error or defect in the proceedings," either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed appellant's sentence by the provisions of ง 13A-5-53, Code of Alabama 1975. Section 13A-5-53(a) requires that, in addition to reviewing the case for any error involving the conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant was made in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death was the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death was the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by us of the aggravating and mitigating circumstances indicates that death was the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After appellant was convicted of the capital offense charged, a separate sentence hearing was held before the jury in accordance with ง 13A-5-46. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to any finding of aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict; the jury, by a vote of ten to two, returned the following verdict: "We, the jury, recommend that the defendant, Quang Ngoc Bui, be punished by death."
Thereafter, the trial court held another hearing, in accordance with ง 13A-5-47, to aid it in determining whether it would sentence appellant to death as recommended by the jury or to life imprisonment without the possibility of parole. The trial court ordered and received a written pre-sentence investigation report, as required by ง 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or non-existence of each aggravating circumstance enumerated in ง 13A-5-49 and the existence or non-existence of any mitigating *1118 circumstance in ง 13A-5-51 and ง 13A-5-52, as well as written findings of fact summarizing the crime and appellant's participation in it. In its findings of fact (see "Appendix"), the trial court found the existence of the following aggravating circumstance: The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. ง 13A-5-49(8). The trial court examined the evidence for mitigating circumstances, pursuant to the requirements of งง 13A-5-51 and -52, and found the existence of the following statutory mitigating circumstances: (1) The defendant had no significant history of prior criminal activity; and (2) the capital offense was committed while the defendant was under the influence of extreme emotional disturbance. งง 13A-5-51(1) and (2), respectively.
Thus, the trial court found the existence of one aggravating circumstance and two mitigating circumstances. It weighed the aggravating circumstance and the mitigating circumstances and found that the aggravating circumstance outweighed the mitigating circumstances. The trial court's order in this regard shows the following: "It is the conclusion of this court that the aggravating circumstance of the offense being especially heinous, atrocious or cruel compared to other capital offenses, overwhelmingly outweighs the mitigating circumstances." Having so found, the trial court sentenced appellant to death.
Appellant was convicted of the offense of murder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct, ง 13A-5-40(a)(10). This offense is by statutory definition and designation a capital offense. We take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., Ex parte Crawford, 377 So.2d 159 (Ala.1979), vacated on other grounds, 448 U.S. 904, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980); Jackson v. State, 516 So.2d 726 (Ala.Cr.App.1985), remanded on other ground, 516 So.2d 768 (Ala.1986); Giles v. State, [Ms. 6 Div. 86, January 10, 1984] (Ala.Cr.App.1984); Jones v. State, 520 So.2d 543 (Ala.Cr.App.1984); Hill v. State, 455 So.2d 930 (Ala.Cr.App.), aff'd, 455 So.2d 938 (Ala.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984).
We have carefully searched the record from both the guilt and sentence phases of appellant's trial, and we have found no reversible error. In reviewing the sentence in this case, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We find that the findings and conclusion of the trial court are strongly supported by the evidence. We concur in the verdict of the jury and the findings of the trial court that death is the appropriate sentence in this case. Our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate in relation to this defendant. Considering the crime committed and the defendant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.

ON APPLICATION FOR REHEARING
PATTERSON, Judge.
We have before us for consideration a motion filed by appellant Quang Ngoc Bui, pursuant to A.R.A.P. 39(k), asking that we correct the statement of facts contained in our opinion of April 12, 1988, and adopt his statement of facts as set out in his brief. After considering the motion, we conclude that the statement of facts contained in our opinion is correct and sufficient for understanding the issues presented. The Rule 39(k) motion is denied.
We also have before us an application for rehearing filed by appellant on April 26, 1988. Appellant raises no new issues in this application, and all issues raised were fully addressed by us in our opinion of April 12, 1988, affirming the conviction and sentence.
*1119 On June 16, 1988, appellant filed a supplemental brief directing our attention to the recent decision of the United States Supreme Court in the case of Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and contending that the holding in Maynard is controlling in the instant case. He argues that the aggravating circumstance which we are concerned with hereโthat the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, ง 13A-5-49(8)โis "violative of the Eighth and Fourteenth Amendments" in that it is unconstitutionally vague, and that the case is due to be reversed for "proper sentencing with constitutionally permissible guidelines."
Maynard concerns the aggravating circumstance under the Oklahoma capital murder statute that the murder was "especially heinous, atrocious, or cruel," Okla. Stat., Tit. 21, ง 701.12(4) (1981). This aggravating circumstance is very similar to the aggravating circumstance before us. In Maynard, the jury, the sentencing authority in Oklahoma, was instructed solely in the words of the statute, without any instruction as to what these words meant in the context of a capital crime or what facts would justify the finding of the aggravating circumstance. Furthermore, the Oklahoma appellate court did not examine the jury's finding of the aggravating circumstance in light of any limiting construction, but only held that the crime itself supported the finding. The Supreme Court of the United Stated held that the words of the aggravating circumstance themselves give little guidance as to what facts would be applicable and that, when the jury is given no limiting instructions and the appellate court does not declare any standard by which it is reviewing the finding, the aggravating circumstance as applied in that case is unconstitutional. The Supreme Court indicated that it was not prescribing any particular construction of the aggravating circumstance; it only required that it be limited in some meaningful way.
Maynard is in effect a restatement of the holding in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion), which the Court found controlling in Maynard. In Godfrey, the Supreme Court dealt with a somewhat similar aggravating circumstance, i.e., that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." As was the case in Maynard, the jury was merely read the statutory language with no explanatory instructions. 446 U.S. at 426, 100 S.Ct. at 1763. The Georgia Supreme Court affirmed the finding of the aggravating circumstance without discussing any standard for its review. Id. at 426-27, 100 S.Ct. at 1763-64. The United States Supreme Court reversed, holding that a capital sentence scheme must channel the sentencer's discretion by clear and objective standards and must provide a meaningful basis for distinguishing those cases in which the death penalty should be imposed from those in which it should not. Id. at 427-29, 100 S.Ct. at 1764-65. The Court held that the failure to instruct the jury beyond the words of the statute was not cured by the Georgia Supreme Court's review because, like the Oklahoma court in Maynard, the Georgia Supreme Court pronounced no standard for judging the existence of this aggravating circumstance.
The case at bar is distinguishable from Maynard and Godfrey. Unlike the jury in Maynard and Godfrey, the jury in the instant case was instructed on the meaning of the words of the aggravating circumstance in the context of capital sentencing. These instructions correctly followed the previously recognized limiting construction of the aggravating circumstance established by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330 (Ala.1981), wherein the court stated: "The aggravating circumstance listed in ง 13-11-6(8) [now ง 13A-5-49(8) ] was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Id. at 334. In defining the circumstances under which the aggravating circumstance could be applied, the Alabama Supreme Court expressly followed Godfrey. Id. In the present case, the trial court instructed the jury, as follows:

*1120 "The aggravating circumstance which you may consider in this case, if you find from the evidence that may have been proven beyond a reasonable doubt, is as follows: The capital offenseโand this is the aggravating circumstanceโof this capital offense was especially heinous, atrocious or cruel compared to other capital offenses.
"The term heinous means extremely wicked or sharply evil. The term atrocious means outrageously wicked and violent. The term cruel means it is defined to inflict a high degree of pain with utter indifference or even enjoyment of the suffering of others.
"What intends to be included in this aggravating circumstance is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the normal capital offense.
"For a capital offense to be especially heinous, atrocious or with any brutality which is involved in it, it must exceed that which is normally present in any capital offense.
"For a capital offense to be especially cruel, it must be a ... conscienceless or pitiless crime which is unnecessarily torturous to the victim.
"All capital offenses are heinous, atrocious and cruel to some extent. What is intended to be covered by these aggravating circumstances are only those cases in which the degree of heinousness, atrociousness or cruelty exceeds that which will always exist when a capital offense is committed."
After the jury returned an advisory verdict recommending that the penalty be death and after the trial court conducted a second sentencing hearing, the trial court found the following:
"The Court does find from the evidence presented at the trial that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses.
". . .
"It is the conclusion of the court that the aggravating circumstance of the offense being especially heinous, atrocious or cruel compared to other capital offenses, overwhelmingly outweighs the mitigating circumstances."
Also, unlike the state appellate courts in Maynard and Godfrey, this court in its opinion of April 12, 1988, stated specifically the basis for its affirmance of the trial court's finding of this aggravating circumstance. We weighed the evidence in light of the limitations placed upon the construction of the aggravating circumstance by Kyzer and concluded that the "prolonged pain and terror" obviously experienced by the appellant's children as they slowly bled to death satisfied the requirements of Kyzer.
Appellant seems to argue that the aggravating circumstance is unconstitutional on its face. If this is his argument, it is without merit. The aggravating circumstance is not unconstitutional on its face. Godfrey v. Georgia; Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Court in Maynard held the Oklahoma aggravating circumstance to be unconstitutional as it was applied in that case.
For the above reasons, we hold that Maynard has no application to this case. In considering appellant's application for rehearing, we have reviewed our opinion and decision of affirmance and have considered appellant's briefs filed in support of his application, and we are not persuaded to alter our holding. The application for rehearing is overruled.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED; MOTION DENIED.
All Judges concur.
APPENDIX

In the Circuit Court for Montgomery County, Alabama

State of Alabama, Plaintiff

vs.

Quang Ngoc Bui, Defendant

Case No. CC-86-647-PR

ORDER
Quang Ngoc Bui stands convicted by a jury of his peers of the capital offense of *1121 murder in violation of Alabama Code Section 13A-5-40(a)(10).
In a separate sentencing phase, the same jury returned its advisory verdict that the Defendant be sentenced to death.
The Court, in accord with the statutory directives set forth in Section 13A-5-47, Code of Alabama, has ordered and received a written pre-sentence report which has been made part of the record of this case. No part of this pre-sentence report has been, or shall be, kept confidential.
The State and Defendant have been given the right to present evidence to the Court about any part of the report. The Court has considered the pre-sentence report as to the background of the Defendant and as to other information in the report which is prescribed by law or court rule for felony cases generally. The Court, however, has made its own independent analysis of the existence or nonexistence of aggravating and mitigating circumstances. The Court has made its own special application of the facts which the Court has heard and carefully reviewed to the enumerated aggravating circumstances (sections 13A-5-51 and 13A-5-52, Code of Alabama).
The parties have been given full and ample opportunity to present arguments concerning the existence of aggravating and mitigating circumstances.
The Court now, in accord with Alabama Code Section 13A-5-47(d), proceeds to enter written findings of fact summarizing the crime and the Defendant's participation in it. The Court also proceeds to enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, Code of Alabama, each mitigating circumstance enumerated in Section 13A-5-51, Code of Alabama.

SUMMARY OF CRIME AND THE DEFENDANT'S PARTICIPATION IN IT
Quang Ngoc Bui, the Defendant, is a carpenter by trade. He came to the United States from Viet Nam in or during the year 1975. He has not become a naturalized citizen.
The defendant met his wife, Jennie Bui in New Orleans, Louisiana shortly after his arrival in the United States. Within a year, they got married and have lived together as husband and wife for about ten (10) years; during this time, they had three (3) children, Phi Ngoc Bui; 8 years of age, Julie Quang Bui, 6 years of age and April Nicole Bui, 4 years of age.
There is evidence that during the ten years the defendant and his wife separated and lived apart for short intervals due to "his jealousy" or his suspicion of her "running around with other men." There is also evidence that the defendant occasionally displayed violent tendencies. In one such instance, the defendant threatened to harm his wife with a machete while she was holding their four (4) month old child.
There is evidence that the defendant's wife, her boyfriend, sister and nephew conspired in 1984 to have the defendant arrested and convicted on an illegal possession of drugs charge. However, after a thorough investigation, law enforcement cleared the defendant of the charge.
On the night of the crime, the defendant had at least two (2) telephone conversations with his wife. His wife had left home and he was trying to get her to return. During the last conversation, the defendant told the wife that if she did not return, he would kill the children and himself and get out of her life.
Thereafter, the evidence shows that the defendant dressed his three (3) children in what is described as their better clothes and cut the throat of each child; then, he cut his own throat and lay beside the children on the bed. The Pathologist and the emergency room doctor testified that in their opinion it would have taken each child from twenty (20) to thirty (30) minutes to die because of the nature of the wounds. It would have taken this length of time for the blood to drain from their brains, which was the cause of death.
Approximately thirty (30) minutes after the children were cut, the police arrived at defendant's residence based on a call from *1122 Jennie Bui stating that she feared for the safety of her children. When the police arrived, they found the three (3) children and the defendant lying on the bed. The children were dead; the defendant was bleeding from his wounds. The defendant was treated by the paramedics and taken to Jackson Hospital Emergency Room where he was treated for his wounds and released to the custody of the Montgomery Police Department. Upon arriving at the Police Department, the defendant was advised of his constitutional rights and thereafter consented to give a statement setting forth the facts surrounding his children's death. The defendant, pertinent herein, stated as follows in his signed statement ("Q" connotes the question by the investigator and "A" connotes defendant's answer).
Q: Mr. Bui, if you would tell me the events of this past night which was 2/6/86 at approximately 12:00 to 12:30 midnight at your house at 3081 Simmons Road in Montgomery. Tell me what happened last night at your house.
A: My wife running around, she's running around, she don't think I know it, but I know, and I love her very much she does not, I think she don't love me.
Q: Lean up here and talk a little bit louder. You said your wife runs around on you and she don't think you know but you do?
A: Yes.
Q: All right. Then what did you say after that?
A: I love her too much. I don't want her, she do that to me.
Q: All right.
A: And I want my kids have their mommy, cause their mama can take care of the kids.
Q: Okay
A: She done leave me before, been two days ago. I watched a Vietnam movie. I saw all the people in my country and I miss my family. I was upset about that. And she thinks I mad at her and then she leave and later she called, she said she don't want to come back. She said because she's scared of me. But I told her nothing to be scared of me. I love you very much so why don't you come back and live with the kids so the kids have their mama.
Q: All right.
A: She keep saying I can't.
Q: She kept saying what?
A: I can't, I cannot go back. I asked her why.
Q: What was that?
A: I asked her why. She kept saying I can't.
Q: Okay.
A: She say she don't want come back.
Q: Okay.
A: She say she had to go. She said she had to go. She hang up the phone.
Q: Okay.
A: And the next morning she called me back. I kept asked her coming back. She say no.
Q: Okay.
A: And I get at her over and over. She still don't want to come on back. The kids cry, say when she coming back.
Q: Okay, What then?
A: I asked her if I die. I wanted she be happy.
". . . .
Q: Okay.
A: And later my wife called again, we kept talking about that.
. . . .
Q: Okay. What happened after that?
A: And later around nine o'clock she call me back and we kept talking. I kept why don't she come on back. I told her you been kidding me a long time now. You don't think I know you do. She say why you talked, that happened a long time ago.
Q: Okay.
A: She said she don't and I say if you don't, you don't want to leave me right now, you hurt me too much too many times, but I still love you, forget about what happened to me all that time.
Q: Okay, sir. What happened then?
A: We kept talking over and over. I want she coming back but she don't want to.

*1123 Q: Then what?
A: I told her call me back eleven o'clock.
. . . .
Q: Then what happened?
A: Then she call me back at eleven.
Q: Okay.
Q: I told her I love her too much, very much, I want she coming back. I say you can do it if you wanted to.
. . . .
Q: Okay. Then what?
A: I told her if I die what she want to do.
Q: Okay.
A: And I say if me and the kids die, what you want to do. she said she don't know. I asked her why you don't know. You might be happy with somebody, that why you don't care nothing about me and the kids. You don't want coming back.
Q: Okay. What then sir? What happened after that?
A: She say she love me.
Q: Okay.
A: I say no you don't.
Q: Okay.
A: I say if you love me you don't want to leave me and the kids like this. You don't want to hurt me, but when I die I want you to be happy. She said no, you don't love me and the kids.
. . . .
Q: Okay. Then what happened? What happened next, Mr. Bui?
A: I say no you don't love me and the kids.
Q: Okay.
A: She say yea, she do. I said no you don't.
Q: Then what?
A: Then I got mad. I told her to get here in fifteen minutes.
Q: You told her to get there in fifteen minutes?
A: Yea, to see the kids and me, their life time, one more time. She said no I can't.
Q: Okay.
A: I say why. She say no I can't. She said she got to go and I hang the phone up. And I was mad that time.
Q: What happened next, Mr. Bui?
A: The when she called me she said she have the kids, but you know, I told her no, you can't have the kids because I was scared somebody might hurt them, if you get them you marry again.
Q: So you told her what now?
A: I told her I scared somebody might hurt them. I don't want nobody to hurt them. If you marry again you have somebody, you know.
Q: Okay.
A: You know.
Q: What happened then, sir?
A: I know she does not love me and kids. If she loved me and kids, she would come back.
Q: All right. Well, what happened when you waited til fifteen or twenty after twelve?
A: I waited for her to come but she don't come.
. . . .
Q: All right. What happened after you waited on her?
A: I think she don't love me and the kids, that's why she don't come back to see them.
Q: Okay.
A: That's why I got mad at her.
Q: You got mad?
A: Yea. I lost my temper. I lost my temper.
Q: Your what?
A: I lost my mind.
A: All right. You lost your mind. And then what happened?
A: And I killed the kids so she can't have the kids.
Q: Okay. How did you kill the kids? Mr. Bui, let me ask this sir. What did you use when you killed them? What type weapon?
A: Grocery knife.
Q: Grocery knife? *1124 A: Yea.
Q: Where were the children at when you killed them?
A: They in the bed asleep.
. . . .
Q: What, where did you get the knife from that you used?
A: In my house, cut the, cut the groceries with.
. . . .
Q: Did they say anything when you cut them? Did they ever say anything when you cut them?
A: They said it hurt.
Q: What did you do after you killed the children?
A: I was to kill myself. I wanted to die with my kids, because I love my wife too much. I don't want to see her with other men.
. . . .
Q: All right. How long had you thought about killing your children before you actually carried it out?
A: It was a lot of times when I talked to my wife on the phone.
Q: A lot of times you thought about it?
A: Yes
. . . .
SPECIFIC FINDINGS CONCERNING THE EXISTENCE OR NONEXISTENCE OF EACH AGGRAVATING CIRCUMSTANCE ENUMERATED IN SECTION 13A-5-49; EACH MITIGATING CIRCUMSTANCE ENUMERATED IN SECTION 13A-5-51; AND ANY ADDITIONAL MITIGATING CIRCUMSTANCES OFFERED PURSUANT TO SECTION 13A-5-52.

ENUMERATED AGGRAVATING CIRCUMSTANCES
The capital offense was not committed by a person under sentence of imprisonment.
The Defendant has not been previously convicted of another capital offense nor of a felony involving the use or threat of violence to the person.
This offense is not considered by the Court to involve the aggravating circumstance of "knowingly creating a great risk of death to many persons."
The offense was not committed while the Defendant was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after commiting or attempting to commit, rape, robbery, burglary or kidnapping.
The offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
The capital offense was not committed for pecuniary gain.
The capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
The Court does find from the evidence presented at trial that the capital offense was especially heinous, atrocious or cruel compared to other capital offense.

MITIGATING CIRCUMSTANCES ENUMERATED AND OTHERWISE PRESENTED
The evidence does not indicate that the Defendant has a significant history of prior criminal activity.
The evidence does indicate that the capital offense was committed while the defendant was under the influence of emotional disturbance, but not under the influence of extreme mental disturbance.
The evidence establishes that the victims were not participants in the defendant's conduct nor consented to it.
The preponderance of the evidence establishes that he was not under extreme duress nor under the substantial domination of another person.
The Court determines from a preponderance of the evidence presented that the defendant did have the capacity to appreciate the criminality of his conduct, although he was suffering from emotional disturbance.
The evidence indicates that the Defendant was thirty-four years of age at the time of the capital offense.
*1125 In addition to the above enumerated mitigating circumstances, the Defendant has been given the opportunity to present any other evidence of mitigating circumstances.
The Court has also considered the jury recommendation of the sentence of death. This recommendation is expressly made advisory and non-binding by Section 13A-5-47(e) Code of Alabama. The advisory verdict is one of many facts to be considered against other facts and circumstances.

CONCLUSION
All of the proper evidence being received and arguments given, the Court has weighed each individual aggravating circumstance as it applies to the defendant and has weighed such aggravating circumstances collectively.
It is the conclusion of this Court that the aggravating circumstance of the offense being especially heinous, atrocious or cruel compared to other capital offenses, overwhelmingly outweighs the mitigating circumstances. It is, therefore, this Court's opinion that the death penalty be imposed upon Quang Ngoc Bui.
 DONE this 11th day of July, 1986.
 (s) Charles Price
 CHARLES PRICE, Circuit
Judge
NOTES
[1] The trial court's sentencing order setting out written findings as to aggravating and mitigating circumstances and written findings of facts summarizing the crime and appellant's participation in it is attached hereto, made a part of this opinion, and marked "Appendix."
[2] Appellant's motion was untimely, for it was made after the jury had been selected and sworn and the remaining unselected venire persons had been dismissed. United States v. Forbes, 816 F.2d 1006 (5th Cir.1987); Kemp v. State, 516 So.2d 848 (Ala.Cr.App.1987); Edwards v. State, 515 So.2d 86 (Ala.Cr.App.1987); Raines v. State, 515 So.2d 82 (Ala.Cr.App.1987); Thornton v. State, 513 So.2d 83 (Ala.Cr.App. 1987); Swain v. State, 504 So.2d 347 (Ala.Cr. App.1987).